The STATE of Ohio, Appellee,

v.

GRINNELL, Appellant.

[Cite as *State v. Grinnell* (1996), 112 Ohio App.3d 124.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 95APA10–1314.

Decided June 27, 1996.

126

*Mark E. Piepmeier* and *William E. Breyer,* for appellee.

*Schottenstein, Treneff & Williams* and *Joseph D. Reed,* for appellant.

BOWMAN, Judge.

On April 11, 1993, a riot occurred at the Southern Ohio Correctional Facility ("Lucasville") located in Lucasville, Ohio. The riot began in mid-afternoon when a group of prisoners, who were returning to their cells from a recreation area, attacked several guards.

The prison complex at Lucasville has three main residential areas designated J–Block, K–Block and L–Block. The residential area designated L–Block is entered by passing through two large gates to a main corridor with a large gym at the end. Between the second gate and the gym, cell block ranges run off the main corridor. There are eight such ranges in L–Block, numbered L–1 through L–8. Each cell block range contains eighty cells, with twenty cells located on a lower left-hand level, twenty cells located on a lower right-hand level, twenty cells located in an upper left-hand level, and twenty cells located in an upper right-hand level. At the front of each cell block range is a console which consists of two panels with electric switches to open and close all of the doors to the cells and showers. The console area can accommodate two to three people and is designed to give a view of the entire cell block area. From the console, the operator can see the area in front of each cell door, but not necessarily into each cell.

The riot was apparently planned and instigated by a group of Muslim prisoners. The rioting prisoners seized control of various cell ranges. The events which gave rise to the charges against appellant, Timothy Grinnell, occurred in the L–6 cell block.

The Muslims were in control of the L–6 cell block, while other groups were in control of the other cell blocks. At the time the riot began, a number of things occurred simultaneously. When the inmates first took control, all of the prisoners held in L–6 were ordered out of their cells and into the corridor. Then various other prisoners were locked into the cells, allegedly for their own safety

and protection, by the Muslims. Thereafter, permission had to be obtained from the inmates in charge of L–6 to enter or leave the area.

At some time on April 11, another group of seven to ten prisoners, who were not Muslims and who were also known as "the death squad," entered L–6, apparently led by Keith Lamar ("Lamar group"), with the intent of killing some of the prisoners housed in the cells in L–6 who were thought to be snitches (informers). The Lamar group was allowed to enter the L–6 area by the Muslim leaders. As the Lamar group went from cell to cell, appellant operated the console and opened the cell doors as requested by the Lamar group. The opening of the cell doors allowed the Lamar group access to various inmates, who were then beaten. Two inmates, Darrell Depina and Albert Staiano, were beaten to death. At one point, the Lamar group approached a cell holding five inmates,[1] and demanded that appellant open the cell door; however, appellant refused and the Lamar group moved on.

Eventually the inmates surrendered and the state regained control of L–Block on April 22, 1993. As a result of his participation in the riot, appellant was indicted and charged with two counts of aggravated murder in connection with the deaths of Depina and Staiano. After a trial in which the jury found appellant guilty of both counts, he was sentenced to twenty years to life on each charge. Appellant filed a timely notice of appeal and sets forth the following assignments of error:

"I. The trial court erred by overruling defendant-appellant's motion to dismiss on the grounds that defendant-appellant was denied his right to a speedy trial as guaranteed by the Sixth Amendment to the Constitution of the United States, Article I, Section 10 of the Constitution of the state of Ohio and Ohio Revised Code Section 2945.71.

"II. The trial court erred by overruling defendant-appellant's motion to dismiss on the basis that the plaintiff-appellee failed to establish the requisite jurisdiction of the court.

"III. The trial court erred by overruling defendant-appellant's motion for directed verdict of acquittal pursuant to Rule 29 of the Ohio Rules of Criminal Procedure.

"IV. The trial court erred by refusing to instruct the jury on the defense of duress or coercion as requested by the defendant-appellant.

---

1. Those inmates included Michael Trocadoro, who had a reputation as a very dangerous or treacherous inmate, and his close associates, Greg Vierra, Mike Primes, Robert Graf and an individual whose last name was Comerford.

"V. The trial court erred by overruling the objection of the defendant-appellant to the introduction of an alleged statement of defendant-appellant in plaintiff-appellee['s] rebuttal.

"VI. The conviction of the defendant-appellant was against the manifest weight of the evidence and should have been set aside.

"VII. The court erred by overruling the defendant-appellant's motion to dismiss the indictment on the grounds that it was constitutionally deficient as a matter of law."

In his first assignment of error, appellant contends that he was deprived of his right to a speedy trial pursuant to the United States and Ohio Constitutions and R.C. 2945.71. The speedy trial provisions set forth in R.C. 2945.71 are coextensive with the speedy trial rights guaranteed by the United States and Ohio Constitutions. *State v. O'Brien* (1987), 34 Ohio St.3d 7, 516 N.E.2d 218.

R.C. 2945.71 provides:

"(C) A person against whom a charge of felony is pending:

" * * *

"(2) Shall be brought to trial within two hundred seventy days after his arrest.

" * * *

"(E) For purposes of computing time under divisions (A), (B), (C)(2), and (D) of this section, each day during which the accused is held in jail in lieu of bail on the pending charge shall be counted as three days. This division does not apply for purposes of computing time under division (C)(1) of this section."

Appellant first contends that he is entitled to the triple-time provision set forth in R.C. 2945.71(E). However, at the time of the events which gave rise to the pending charges, appellant was serving six to twenty-five years on a conviction of aggravated robbery in Montgomery County in November 1981.[2] Therefore, inasmuch as appellant was being held on more than just the pending charges, he was not entitled to the benefit of the triple-count provisions of the statute.

Appellant next contends that he was not brought to trial within the time period set forth in R.C. 2945.71(C)(2), as he was taken into administrative custody

---

2. This court notes that the indictment specifies that appellant was previously convicted of aggravated robbery in Montgomery C.P. No. 80–CR–1484 on November 11, 1981, while the bill of particulars states that appellant was previously convicted of aggravated murder in Montgomery C.P. No. 80–CR–1484 on November 11, 1981. State's exhibit 12 is an entry and order from the Montgomery County Common Pleas Court in case No. 80–CR–1484 that states that, on November 11, 1981, appellant was convicted of aggravated robbery.

by the prison officials on May 6, 1993, as the result of his participation in the prison riot. Appellant contends that this administrative detention was the equivalent of an arrest and that the computation of time for speedy trial should begin on that date. We reject this argument.

The record does not reflect, and there is nothing before this court other than appellant's assertions, that he was placed in administrative custody for his participation in the riot. Nor is there any evidence as to when this administrative detention was alleged to have occurred. In addition, while the issue of administrative detention has not been addressed by the Ohio or United States Supreme Courts, a number of federal appellate courts have considered and rejected appellant's argument that the time for speedy trial, for a defendant already serving time, begins to run when the defendant is placed in some form of administrative detention, and we find those arguments persuasive.

In *United States v. Clardy* (C.A.9, 1976), 540 F.2d 439, the appellants contended that their speedy trial rights pursuant to the Sixth Amendment began to run when they were segregated from the general prison population as the result of stabbing another inmate in a fight over repayment of a loan. The court stated, at 441:

"Both appellants contend that the failure to commence trial sooner deprived them of their speedy trial rights under the Sixth Amendment. That right assertedly attached when appellants were de facto arrested by being placed in segregated confinement after the attack. However, such discipline is not an 'arrest' for speedy trial purposes. * * * The identifying indicia of a de facto arrest sketched in *United States v. Marion*, 404 U.S. 307, at 320, 92 S.Ct. 455 [463], 30 L.Ed.2d 468 [478–479] (1971), are for the most part absent here. The prison discipline did not focus public obloquy upon appellants, did not disrupt their 'employment' or drain appellants' financial resources. In short, it was not a public act with public ramifications, but a private act. Actual physical restraint may have increased and free association diminished, but unless we were to say that imprisonment *ipso facto* is a continuing arrest, these criteria bear little weight in the peculiar context of a penal institution where the curtailment of liberty is the general rule not the exception. Thus, speedy trial rights did not come into play until April 1, 1975, when appellants were indicted, and therefore, for purposes of such rights, the delay was only two months and 28 days." See, also, *United States v. Daniels* (C.A.4, 1983), 698 F.2d 221; *United States v. Blevins* (C.A.5, 1979), 593 F.2d 646.

Thus, we conclude that appellant's speedy trial rights did not accrue on May 6, 1993, but, rather, began on May 19, 1994, when appellant was indicted on two counts of aggravated murder. Inasmuch as appellant was already in prison, he was not arrested and taken into custody in the usual manner but was served with

a summons on May 26, 1994. Regardless, for purposes of this opinion, we will assume appellant was arrested on the date his indictment was issued, May 19, 1994.

█ Appellant further contends that, assuming that a date later than May 6, 1993 is used, he still was not brought to trial within two hundred seventy days as set forth in R.C. 2945.71(C)(2). Prosecutors and the trial courts have a duty to comply with R.C. 2945.71. *State v. Reeser* (1980), 63 Ohio St.2d 189, 17 O.O.3d 117, 407 N.E.2d 25. Any extensions of time that are tolled pursuant to R.C. 2945.72 [3] must be strictly construed against the state. *State v. Singer* (1977), 50 Ohio St.2d 103, 4 O.O.3d 237, 362 N.E.2d 1216. Once a defendant has shown that two hundred seventy days have elapsed, a prima facie case for discharge, pursuant to R.C. 2945.73(B), has been established, and the state then bears the burden to show that the defendant was timely tried.

A review of the record shows that appellant failed to make a prima facie showing that he was not brought to trial within two hundred seventy days. Prior to the commencement of trial, an oral motion to dismiss for lack of speedy trial was made. Appellant's attorney stated:

"MR. REED: Your Honor, we have—we're making now an oral motion, and a motion was filed on August 22nd alleging that the case ought to be dismissed for denial of speedy trial."

No other information was provided to the court to demonstrate how appellant calculated that more than two hundred seventy days had elapsed. See *State v. Howard* (1992), 79 Ohio App.3d 705, 607 N.E.2d 1121.

█ The record reflects that, on August 22, 1995, appellant, *pro se*, filed a motion to dismiss for lack of speedy trial, premised on R.C. 2941.401, that calculated the number of days elapsed. However, this court finds that R.C. 2941.401 has no application here since its intent is to provide an analogous speedy trial right to Ohio prisoners who have additional charges pending against them. The one-hundred-eighty-day time period set forth in R.C. 2941.401, within which a defendant imprisoned on other charges must be tried, does not begin to run until a notice of request for disposition of the untried indictment has been filed

---

3. R.C. 2945.72 provides:

"The time within which an accused must be brought to trial, or, in the case of felony, to preliminary hearing and trial, may be extended only by the following:

"* * *

"(E) Any period of delay necessitated by reason of a plea in bar or abatement, motion, proceeding, or action made or instituted by the accused;

"* * *

"(H) The period of any continuance granted on the accused's own motion, and the period of any reasonable continuance granted other than upon the accused's own motion[.]"

with the county prosecutor. *State v. Logan* (1991), 71 Ohio App.3d 292, 593 N.E.2d 395. There is no evidence in the record that appellant ever made such a demand.

Assuming *arguendo* that appellant presented a prima facie showing that he was not brought to trial within two hundred seventy days, we nonetheless find that the state met its burden to show that appellant was timely tried and that the trial court properly overruled the motion to dismiss.

In *State v. King* (1994), 70 Ohio St.3d 158, 637 N.E.2d 903, the Ohio Supreme Court held, at the syllabus:

"To be effective, an accused's waiver of his or her constitutional and statutory rights to a speedy trial must be expressed in writing or made in open court on the record. (*State v. O'Brien* [1987], 34 Ohio St.3d 7, 516 N.E.2d 218, applied and followed; *State v. Mincy* [1982], 2 Ohio St.3d 6, 2 OBR 282, 441 N.E.2d 571, followed.)"

The court further stated, at 161, 637 N.E.2d at 905:

"From the court's decision in *O'Brien* we can infer that a court's reliance on an *un*journalized oral waiver, alleged or actual, is not effective. * * *

"[W]e are unable to determine the existence in the record of any conclusive evidence regarding waiver. * * * The conclusion that we draw from *O'Brien,* and which is suggested by the other cases cited above, is that a waiver of speedy trial rights must be expressly written or in some form that can be conclusively determined from the record. * * * [T]o be effective, an accused's waiver of his or her constitutional and statutory right to a speedy trial must be expressed in writing or made in open court on the record." (Emphasis *sic.*)

As in the record in *King,* there is little conclusive evidence that appellant waived his right to a speedy trial in this case, except for one instance when a continuance was requested.

Following appellant's arraignment on June 2, 1994, the court's entry states in part:

"This cause came on to be heard June 2, 1994, upon the arraignment of the defendant. A plea of not guilty was entered for the defendant and his rights either explained to him or were waived."

Although a court reporter was present for the arraignment, a transcript of that proceeding has not been provided to this court and is not part of the record. There is no written entry of appellant's not guilty plea which states whether time was waived. Clearly, this does not meet the requirements of *King* so as to demonstrate a waiver of speedy trial rights.

In a *nunc pro tunc* entry dated December 2, 1994, the court stated:

"Defendant previously waived time for trial purposes on November 14, 1994 and has in open court on December 2, 1994, reiterated that waiver of time for purposes of conducting the trial on May 30, 1995 at 9:00 A.M. Defendant is to submit said time waiver in writing. * * * "

Again, no transcript of the November 14, or December 2, proceedings is a part of the record. Assuming, without deciding, that the trial court's recitation of appellant's waiver of speedy trial rights does not comport with *King* and appellant did not waive his speedy trial rights, we conclude nonetheless that appellant was brought to trial within the two hundred seventy days set forth in R.C. 2945.71.

■ On July 19, 1994, appellant filed a motion for a bill of particulars and a motion for change of venue. The motion for change of venue was granted November 1, 1994, and the bill of particulars was filed November 3, 1994. At the time the motion for change of venue was filed, sixty-one days had elapsed which must be charged to the state. A motion for a bill of particulars and a motion for a change of venue both toll the time for speedy trial. *State v. Brownlow* (1991), 75 Ohio App.3d 88, 598 N.E.2d 888; *State v. Willey* (1981), 5 Ohio App.3d 86, 5 OBR 200, 449 N.E.2d 471.

■ Contrary to appellant's assertions at oral argument, while *King* requires a waiver of speedy trial rights to be in writing or made in open court on the record, *King* does not require every motion filed by a defendant to also assert a waiver of speedy trial time for purposes of the motion. The act of filing most motions by a defendant in and of itself tolls the time pursuant to R.C. 2945.72(E).

■ While the motions for change of venue and a bill of particulars were pending, appellant also filed several other motions that tolled the time. On October 25, 1994, he filed a motion to suppress statements, which was overruled on January 4, 1995. In *State v. Walker* (1974), 42 Ohio App.2d 41, 71 O.O.2d 238, 327 N.E.2d 796, the court held that a motion to suppress tolls the time for speedy trial. On November 2, 1994, appellant filed a motion to suppress eyewitness identification and a motion to dismiss the indictment, both of which were overruled on May 12, 1995. A motion to dismiss an indictment tolls the period of time for speedy trial. *State v. Bickerstaff* (1984), 10 Ohio St.3d 62, 10 OBR 352, 461 N.E.2d 892. Thus, from July 19, 1994 to May 12, 1995, various motions filed by appellant were pending, each of which tolled the time. R.C. 2945.72(E).

Further, appellant filed a request for a continuance of the trial date set for November 14, 1994, due to the need for additional time to investigate. While the record does not contain an entry continuing the trial date, a new date was set on

May 30, 1995.[4] Apparently, a pretrial conference was held in May, at which time appellant allegedly requested another continuance and a final trial date was set for September 5, 1995. Even assuming that the trial court's *nunc pro tunc* entry filed August 2, 1995,[5] stating that the continuance of the trial from May 30, 1995 to September 5, 1995 was at appellant's request, was not sufficient to comply with *King,* only an additional ninety-seven days elapsed that may be chargeable to the state, bringing the total number of elapsed days chargeable to the state to one hundred fifty-eight. Therefore, even assuming that appellant never waived time, except as set forth above, he was still brought to trial within the time limits set forth in R.C. 2945.71. Appellant's first assignment of error is overruled.

In his second assignment of error, appellant asserts that the trial court erred in overruling his motion to dismiss for lack of jurisdiction, pursuant to R.C. 2931.03, since no evidence was presented that the murders occurred in Scioto County.

Appellant confuses the concepts of jurisdiction and venue. Jurisdiction refers to the authority of a court to hear and determine an issue; venue refers to the county in which the offense is alleged to have been committed and where it is to be tried. *State v. Giffin* (1991), 62 Ohio App.3d 396, 575 N.E.2d 887. The jurisdiction of the court of common pleas to hear a charge of aggravated murder is set forth in R.C. 2931.03, which provides:

"The court of common pleas has original jurisdiction of all crimes and offenses, except in cases of minor offenses the exclusive jurisdiction of which is vested in courts inferior to the court of common pleas."

Venue, not jurisdiction, which is the basis of appellant's assignment of error, is set forth in Section 10, Article I of the Ohio Constitution and R.C. 2901.12(A), which provide, respectively:

" * * * In any trial, in any court, the party accused shall be allowed * * * a speedy public trial by an impartial jury of the county in which the offense is alleged to have been committed * * *."

---

4. Defendant's *pro se* motion to dismiss for lack of speedy trial admits that he waived time to May 30, 1995, and states:

" * * * Defendant was indicted May 19, 1994 and agreed to a continuance November 14, 1994 which was the 180th day, Defendant's trial was continued to May 30, 1995 * * *."

5. The trial court's entry stated:

"Defense counsel represented the need for a variety of lengthy transcripts to be prepared and the Court also had scheduling conflicts, whereby manifest justice and the interest of a fair trial for defendant demand that the trial date be postponed with the first available week defense counsel and the Court are available being September 5, 1995. The State of Ohio and defense counsel represented that they are respectively available on September 5th and the week thereafter and with no objection said trial date is hereby rescheduled."

"(A) The trial of a criminal case in this state shall be held in a court having jurisdiction of the subject matter, and in the territory of which the offense or any element of the offense was committed."

In *State v. Headley* (1983), 6 Ohio St.3d 475, 477, 6 OBR 526, 528, 453 N.E.2d 716, 718, the Ohio Supreme Court stated:

"Although it is not a material element of the offense charged, venue is a fact which must be proved in criminal prosecutions unless it is waived by the defendant. *State v. Draggo* (1981), 65 Ohio St.2d 88, 90 [19 O.O.3d 294, 295, 418 N.E.2d 1343, 1345]. The standard of proof is beyond a reasonable doubt, although venue need not be proved in express terms so long as it is established by all the facts and circumstances in the case. *State v. Dickerson* (1907), 77 Ohio St. 34 [82 N.E. 969], paragraph one of the syllabus."

 Robert Bass and Jack Spurlock, both inmates at Lucasville when the riot occurred, testified that Lucasville is located in Scioto County. Further, Sergeant Howard Hudson of the Ohio State Highway Patrol ("highway patrol") testified that, on April 11, 1993, he was working for the highway patrol and was assigned to the Jackson 9 District Headquarters, which covers the southeastern counties of Ohio. Sergeant Hudson testified that, on April 11, 1993, he was working in Scioto County and, late in the afternoon, was ordered to respond to the riot at the Lucasville prison.

From the direct express testimony of Bass and Spurlock, and the reasonable inferences to be drawn from the testimony of Sergeant Hudson, there was evidence that showed beyond a reasonable doubt that the murders took place in Scioto County. Therefore, venue was established and the trial court did not err in overruling appellant's motion to dismiss. Appellant's second assignment of error is overruled.

Appellant's third and sixth assignments of error are related and will be addressed together. In his third assignment of error, appellant contends that the trial court should have granted his motion for acquittal, pursuant to Crim.R. 29, made at the close of the state's case. In his sixth assignment of error, appellant contends that the verdict is against the manifest weight of the evidence.

Crim.R. 29(A) provides:

" * * * The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses. The court may not reserve ruling on a motion for judgment of acquittal made at the close of the state's case."

When ruling on a defendant's motion for judgment of acquittal pursuant to Crim.R. 29, the trial court is required to construe the evidence most strongly in favor of the state, the party against whom the motion has been directed. *State v. Fyffe* (1990), 67 Ohio App.3d 608, 588 N.E.2d 137. An entry denying the motion is proper if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt. *State v. Wolfe* (1988), 51 Ohio App.3d 215, 555 N.E.2d 689.

When reviewing the sufficiency of the evidence in a criminal case, this court must examine the evidence admitted at trial and determine whether the evidence, if believed, would convince the average mind of appellant's guilt beyond a reasonable doubt. The inquiry is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492.

A reviewing court may not reverse a judgment of conviction in a criminal case where the guilty verdict was returned by the trier of fact on sufficient evidence and no prejudicial error occurred in the trial of the case. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212. The determination of the credibility of the witnesses is the responsibility of the trier of fact, and this court may not reverse a judgment where reasonable minds could reach different conclusions upon the evidence offered at trial. *State v. Antill* (1964), 176 Ohio St. 61, 26 O.O.2d 366, 197 N.E.2d 548. The verdict will not be disturbed unless this court finds that reasonable minds could not reach the conclusion reached by the trier of fact. *Jenks.*

Appellant asserts that the evidence is inconsistent and is nonexistent that he acted purposefully and with prior calculation and design. In addition, appellant asserts that he did not know Staiano and Depina, did not voluntarily participate or assist in beating them to death, did not know that they would be killed and did not agree to their being killed. Appellant also asserts that the evidence shows he had no affiliation with the Lamar group.

Appellant was charged with two counts of aggravated murder pursuant to R.C. 2903.01(A):

"No person shall purposely, and with prior calculation and design, cause the death of another."

"Purposely" is defined in R.C. 2901.22(A) to mean with the "specific intention to cause a certain result."

In interpreting prior calculation and design, the Ohio Supreme Court has held that, while instantaneous deliberation is not sufficient, a prolonged thought

process is not required. In *State v. Cotton* (1978), 56 Ohio St.2d 8, 10 O.O.3d 4, 381 N.E.2d 190, the court held at paragraphs one, two and three of the syllabus:

"1. In a capital case prosecuted under R.C. 2903.01(A), 'prior calculation and design' is a more stringent element than the 'deliberate and premeditated malice' which was required under prior law. R.C. 2903.01(A), construed.

"2. Instantaneous deliberation is not sufficient to constitute 'prior calculation and design.'

"3. Where evidence adduced at trial reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified."

In *State v. Robbins* (1979), 58 Ohio St.2d 74, 12 O.O.3d 84, 388 N.E.2d 755, the court held at paragraph one of the syllabus:

"Where evidence adduced at trial reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified. (*State v. Cotton,* 56 Ohio St.2d 8 [10 O.O.3d 4, 381 N.E.2d 190], paragraph three of the syllabus, approved and followed.)"

While a review of the record shows some inconsistencies in testimony between various witnesses, there was more than sufficient credible evidence to support appellant's conviction beyond a reasonable doubt. The weight to be given to the testimony of the various witnesses and a determination of their credibility are issues to be decided by the jury. *Antill.*

Robert Bass testified that he was housed in the L–6 cell block at the time of the riot and was serving time at Lucasville for robbery and felonious assault. At the time the riot began, Bass tried to get in his cell to secure his property and saw appellant and another inmate known as "Doc Ellis" in the console area. Bass left the L–6 area but returned again to try to retrieve his personal property from the cell and was ordered away from the console area by appellant. Bass observed appellant opening and closing cell doors. Bass also heard appellant giving orders as to where to put various inmates and guards. Bass was required to return to L–6 a third time when threatened by other inmates and was required to remove the bodies of Staiano and Depina. During Bass's three trips in and out of L–6, Bass saw no one giving appellant any orders and observed that he appeared to be in charge of the console and was giving orders as to what cell doors to open and close, as well as responding to requests that particular cell doors be opened and closed.

Jack Spurlock was serving time at Lucasville for aggravated murder and robbery at the time of the riot. Spurlock testified that appellant ordered him to go from cell to cell and to guard the back of the cell area to be certain prison authorities were not attempting to enter the prison. Spurlock observed that appellant was in charge of the console and Spurlock followed appellant's orders because he was a Muslim and the Muslims were in control of the riot. When Spurlock was standing in the back of L–6, he saw one killing. He also observed appellant opening cell doors to accommodate food that was being brought into L–6. In addition, it was Spurlock's observation that there was nothing stopping appellant from leaving the console area or L–6, since no one was surrounding or threatening appellant.

Anthony Walker, another inmate at Lucasville who was serving time for aggravated murder, aggravated burglary, rape and receiving stolen property, was also housed in L–6. Walker saw appellant operating the console and opening the doors to the cells of inmates who had been locked up by the Muslims, in order to provide access to the Lamar group. Walker heard appellant give orders to various inmates, including an order to Eric Girdy to "finish off" an inmate by the name of Svette who had been beaten by the Lamar group, but was not yet dead, as well as an unidentified inmate who had not been touched by the Lamar group whom Girdy found hiding under his bed. Girdy complied with appellant's orders. Appellant also ordered Walker to guard the back door of the cell block and Walker was only allowed to leave L–6 when given permission to do so by appellant. Walker specifically saw appellant open the cell door so that the Lamar group could get to Staiano and beat him to death.

Donald Cassell was serving time at Lucasville for felonious assault and aggravated robbery and was housed in L–6. He saw both Staiano and Depina, whom he knew, murdered as a result of appellant's opening the doors of the cells they had been locked in so that the Lamar group had access to them. Cassell testified that, when the riot began, a corrections officer ran out of the cell block leaving the door to the console area open. He then testified that he saw "another group of guys come in, and he [appellant] ran towards the console, he was opening and closing doors. At this time he was trying to get everything organized." Cassell also stated that, during the time he was in L–6, he saw Ellis, Girdy and an inmate named Artiste up by the console area, but that appellant was the only one he ever saw run the console itself.

Cassell testified that appellant was already operating the console when the Lamar group came into L–6 and, at that time, the doors to cells 14 to 19 were locked with the only access to those cells being from the console which appellant was running. Cassell testified:

"When I say he [appellant] was running the console, he was opening and closing doors. When the death squad came into the block, they couldn't have got into them themselves unless he opened them."

Cassell also testified that no one was around appellant with knives or bats making him open up the doors to the cells. Rather, Cassell testified:

"Q. So did you hear someone giving an order then to Grinnell?

"A. No, inmate, one of the inmates that was in the death squad would holler up to Grinnell to open up cell 14 and he opened up 14, and they went in there, drug him out and killed him."

However, Cassell also stated that Carlos Sanders, who was the spiritual leader and head of the Muslims, told appellant to guard the console and to make sure nothing happened to the inmates locked in the cells. Sanders also put Cassell at the back door to watch those same inmates. During the beatings and killings, Cassell tried to speak up to prevent the actions against the inmates in cells 14 to 19; however, he could not really do anything because the Lamar group all had bats, knives and weight bars. When the Lamar group approached cell nineteen, where Trocadoro, Vierra, Comerford, Graf and Primes were, Cassell testified:

"Yes, they [the Lamar group] was getting ready to enter that cell. Like I said, I was sitting at the back, I was guard at the door. Lamar was the leader of the death squad, he hollered up towards the front, toward the console, told him to bust open 19. 19, cell 19 opened up. I jumped up and told him that Hasan [Carlos Sanders] told me to tell you not to let nothing happen to cell 19. Then Lamar hollered up towards the front again, Grinnell closed the door."

After the beatings and killings were finished, appellant ordered Cassell to help clean up the area. Cassell listened to appellant, even though appellant did not have a weapon, because appellant was a Muslim and the Muslims were controlling the riot.

Greg Vierra was serving time at Lucasville for the unauthorized use of a motor vehicle and kidnapping. Sometime after the riot started, he was placed in a cell in L–6 with his friends, Trocadoro, Primes, Graf and Comerford. The group hung a blanket across the front of the bars so that they could not see or be a part of whatever was going on. They also wrote "we are unarmed" on three of the walls of the cell and also wrote each of their names.

Approximately forty-five minutes after he was locked up, Vierra heard a loud commotion at the front of the range, heard the demand for a cell door to be opened, heard screaming, sounds of metal against flesh and flesh hitting the ground, and then quiet. Then the next cell was opened and he heard the same thing occur. Vierra then testified:

"A. * * * [S]omebody asked, open up 17—open up 18.

"Q. Now, that's—

"A. That's my cell.

"Q. Okay.

"A. And whoever was running the console at the time said no, no one is to mess with those people in that cell. If you have a problem with them, go see Hasan."

Although Vierra was unable to recognize the voice saying "no," their cell door never was opened. Later appellant came to the cell and the blanket was pulled back so that he could talk to them. Vierra testified that appellant told him that he refused to open the door to the cell in which Vierra and his friends were placed so that the other inmates could not get to him and kill him. Appellant also stated that he would not open the door for anyone but Sanders.

Stacey Gordon, who was serving time at Lucasville for aggravated burglary, was a "security amir" with the Muslims and he participated in planning the takeover. At the time the Lamar group entered L–6, Gordon was guarding a corrections officer in L–6, cell 62, and he witnessed the Lamar group's actions. Gordon testified:

"What I saw was some individuals hooded and others wasn't, calling out cell numbers, their locations, to where inmates that was housed in there, and those doors was opened by that gentleman right there, Timothy Grinnell, and individuals went in there with baseball bats and knives and blackjacks, different weapons, and you can hear the screaming and the beating going on, stuff like that."

Gordon also saw appellant go to the cell of an inmate named Tony Taylor and told the Lamar group that he was not to be killed. When the Lamar group went to the cell containing Trocadoro and his group, an argument occurred between appellant, Lamar and another member of Lamar's group, because appellant would not open the door to the cell. Gordon heard appellant state that the Muslims put that group of people in that cell and they were not to be killed. Gordon testified that appellant never opened that cell door.

Gordon also testified that he never saw anyone other than appellant in charge of the console when the beatings and killings occurred, although he saw Girdy and Artiste near the console area controlling the door that gave access to L–6 from the corridor. In addition, Gordon never saw anyone force or make appellant operate the console, nor did he hear appellant give orders or instruct anyone to do anything.

In his defense, appellant presented the testimony of several inmates who stated that appellant was threatened and forced to operate the console or was not present in the area at the time of the killings.

Prentice Jackson, who was at Lucasville serving a sentence for murder and rape at the time of the riot, was housed in L–3. Approximately one and one-half hours after the riot began, he was ordered by unidentified inmates to go to L–6 to get food. At that time, he observed appellant by the water fountain near the console which was being operated by Girdy. Shortly after he entered L–6, a group of men, including Gordon, came to the door and Jackson observed appellant tell the group they could not come in. Jackson testified that appellant was then threatened by Gordon, who ordered appellant to man the console.

Leroy Elmore, who was serving time at Lucasville for murder and who was not housed in the L–Block, entered L–6 out of curiosity approximately twenty minutes after the riot began. When he looked into L–6, he saw Gordon ordering everybody out of the block and Girdy at the control panel. He also saw Gordon threaten appellant and tell him to work the control panel. He also observed masked people with weapons go to the top of the range. Elmore also testified that he did not know how long after appellant was ordered to the console that the murders took place in L–6.

Eddie Moss was housed in the upper range of L–6 at Lucasville serving time for aggravated robbery, attempted burglary and felonious assault. He was in his cell listening to a basketball game when the riot started. Along with other prisoners, he was ordered out of his cell by masked men and, as he was leaving the block, he saw two hooded men at the console, neither of whom he recognized. As he was standing in the corridor by the door to L–6, Moss testified, he saw appellant down by the gym trying to get out of the door and into the recreation yard.

Kenneth Law, who was at Lucasville serving time for rape and drug trafficking, testified that, at approximately 5:00 p.m. on the day the riot started, he went into L–6, where he saw men lying in cells bleeding, some of whom he thought were dead. He observed three men, including appellant and Ellis, in the console area, and appellant was sitting in a chair between the two console panels. Law did not hear appellant give orders to anyone.

Jack Spurlock was recalled by appellant and testified that he was in the back of L–6 approximately two hours after the riot began and that he was by himself for roughly four hours. He was not aware that the Lamar group entered L–6, and he stated that he did not see anyone injured by force.

Appellant's last witness was Trooper Phillip Long, an investigator with the highway patrol, who interviewed people in connection with the Lucasville riot.

On December 7, 1994, Long interviewed Gordon, who told him that Ellis was at the console with appellant but that only appellant operated the console during the homicides. Prior to this interview, on October 25, 1994, Gordon told Long that appellant was trying to get him to lie on appellant's behalf, since they were both Muslims and Muslim ideals permitted lying if it would benefit another Muslim.

Although inconsistencies existed between the various witnesses' testimony, in ruling on a Crim.R. 29 motion, the evidence must be construed in favor of the state, the party against whom the motion is made. In construing the evidence this way, this court finds that reasonable minds could reach different conclusions as to whether each material element of aggravated murder had been proved beyond a reasonable doubt and, therefore, the trial court properly denied appellant's motion for acquittal. Appellant's third assignment of error is over-ruled.

Going further, in reviewing the sufficiency of the evidence, this court finds that there was sufficient evidence, if believed, to convince the average mind of appellant's guilt beyond a reasonable doubt. From his position at the console, appellant had a view of the entire cell block area and opened and closed doors of specific cells on request to give access to the Lamar group so that they could beat or kill those particular inmates. From his position at the console, appellant had to know that the inmates in those cells were being beaten or killed, and his purposeful act of opening the doors to the cells where Staiano and Depina were housed allowed them to be murdered.

Appellant was in charge of the console area and gave orders to other inmates, including an order to kill. He acted purposefully and with prior calculation and design in opening the cells of Staiano and Depina, which resulted in their murders. By the time the Lamar group reached Staiano and Depina's cells, numerous other beatings and killings had occurred. Thus, there were sufficient time and opportunity for appellant to have known what would occur should he open a given cell door. In addition, the circumstances surrounding Staiano and Depina's murders show a scheme designed to implement the calculated decision to kill. As a result, any rational trier of fact could have found the essential elements of aggravated murder proven beyond a reasonable doubt. Thus, appellant's conviction is not against the manifest weight of the evidence. Appellant's sixth assignment of error is overruled.

In his fourth assignment of error, appellant contends that the trial court erred by failing to instruct the jury that duress is a defense to murder. Appellant relies on *State v. Woods* (1976), 48 Ohio St.2d 127, 2 O.O.3d 289, 357

N.E.2d 1059,[6] to support his contention that the jury should have been instructed that duress is a defense to murder; however, this court finds that this reliance is misplaced. In *Woods*, the Ohio Supreme Court recognized that duress or coercion as used in R.C. 2929.04(B), stating criteria for imposing death or imprisonment for a capital offense, could be used in mitigation to reduce a sentence of death to life imprisonment. *Woods* also recognized that, if the defense of duress is proved with regard to the felony underlying the aggravated murder charge, a defendant is only guilty of murder and not aggravated murder. *Woods*, however, did not recognize duress as an affirmative defense to murder. While *Woods* acknowledged that the issue has not been specifically decided in Ohio, the court noted, at 135, 2 O.O.3d at 293, 357 N.E.2d at 1065, fn. 3:

"There is strong precedent for holding that duress is not a defense to murder, but that question has not been decided in Ohio. At common law, no person can excuse himself for taking the life of an innocent person on the grounds of duress."

Here, appellant was charged with aggravated murder pursuant to R.C. 2903.01(A), not 2903.01(B).[7] Thus, there was no underlying felony to which the defense of duress could be raised, and the state did not seek the death penalty for appellant.

■ Even if this court would assume that duress was available as a defense, the trial court correctly refused to give the instruction. Jury instructions which are correct, pertinent and presented in a timely manner must be included in substance in the general charge to the jury. *State v. Barron* (1960), 170 Ohio St. 267, 10 O.O.2d 299, 164 N.E.2d 409. However, abstract rules of law or general propositions, even though correct, should not be given unless they are specifically applicable to the facts in a given case. *State v. Guster* (1981), 66 Ohio St.2d 266, 20 O.O.3d 249, 421 N.E.2d 157.

■ Duress consists of any conduct which overpowers a person's will and coerces or constrains his performance of an act which he otherwise would not

---

6. The language in this case, at 135, 2 O.O.3d at 293, 357 N.E.2d at 1065, stating "This is particularly true since the defendant is required to establish duress or coercion by a preponderance of the evidence for purposes of mitigation" was overruled in *State v. Downs* (1977), 51 Ohio St.2d 47, 5 O.O.3d 30, 364 N.E.2d 1140, vacated in part, *Downs v. Ohio* (1978), 438 U.S. 909, 98 S.Ct. 3133, 57 L.Ed.2d 1153. In addition, certiorari was granted in *Woods v. Ohio* (1978), 438 U.S. 910, 98 S.Ct. 3133, 57 L.Ed.2d 1153, wherein the court also vacated the judgments insofar as it had left undisturbed the death penalties imposed.

7. R.C. 2903.01(B) provides:
"No person shall purposely cause the death of another while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit kidnapping, rape, aggravated arson or arson, aggravated robbery or robbery, aggravated burglary or burglary, or escape."

have performed. Consequently, one who, under the pressure of a threat from another person, commits what would otherwise be a crime may, under certain circumstances, be justified in committing the act and not be guilty of the crime.

One of the essential features of the defense of duress is the sense of immediate, imminent death or serious bodily injury if the actor does not commit the act as instructed. See *State v. Cross* (1979), 58 Ohio St.2d 482, 12 O.O.3d 396, 391 N.E.2d 319. The force used to compel the actor's conduct must remain constant, controlling the will of the unwilling actor during the entire time he commits the act, and must be of such a nature that the actor cannot safely withdraw. See *State v. Good* (1960), 110 Ohio App. 415, 11 O.O.2d 459, 165 N.E.2d 28.

Jackson and Elmore, two inmates who testified on behalf of appellant, both stated that he was threatened by Gordon. Jackson testified:

"Initially started like this. Grinnell was telling Inmate Stacey Gordon, I found out his name later on, I found out his name was Nabil, but Muslim name was Abraham. And he was arguing with Grinnell. Grinnell was telling him he couldn't come in here with his group and Stacey told Grinnell that you will do what we say do or we will deal with you, too, just go over there by that console. That's what I heard."

Elmore testified:

"So as I was looking around, and Stacey Gordon was ordering everybody out the block, but before he did that, he went over to Grinnell and told him to work the control panel or you know what will happen to you or else."

In *Woods,* the court stated:

" 'In determining whether a course of conduct results in duress, the question is not what effect such conduct would have upon an ordinary man but rather the effect upon the particular person toward whom such conduct is directed, and in determining such effect the age, sex, health and mental condition of the person affected, the relationship of the parties and all the surrounding circumstances may be considered.' " 48 Ohio St.2d at 135–136, 2 O.O.3d at 294, 357 N.E.2d at 1065, quoting *Tallmadge v. Robinson* (1952), 158 Ohio St. 333, 49 O.O. 206, 109 N.E.2d 496.

Based on the foregoing, this court finds that appellant has not shown that his criminal conduct occurred as a result of a continuous threat from another person which, because of his fear of bodily harm or death, controlled his will and compelled him to open the various cell doors. There is no evidence in the record as to whether appellant took the alleged threat by Gordon seriously, and appellant's other actions belie his claim that he acted under duress or coercion.

Various inmates testified that appellant gave orders to other inmates not to leave L–6 and, instead, ordered them to act as guards or lookouts in the cell block area, ordered inmates to clean up the area where other inmates had been beaten and killed, ordered where various inmates and corrections officers should be held, and most significantly, refused access to a cell holding Trocadoro and his group, which refusal was accepted by the Lamar group.

Thus, in this case, the evidence would show that, rather than acting under duress and coercion, appellant was a willing participant in the riot and had a role of some authority. Even assuming, *arguendo,* duress to be a valid defense, this court finds that appellant has not proved by a preponderance of the evidence that his conduct is excused or justified because he was acting under the pressure of a threat from another person who would harm him if he did not do as he was told. Appellant's fourth assignment of error is overruled.

In his fifth assignment of error, appellant asserts that the trial court erred in overruling his objection to the state's introduction of rebuttal testimony.

In rebuttal, the state called Sergeant James D. Brink of the highway patrol, Office of Investigative Services, who testified that, during an interview on September 20, 1993, appellant stated that he was never in L–6 but that he spent the entire eleven days of the riot in the corridor. After Brink shared some information with appellant, appellant then stated that he was, in fact, in L–6 but that he did not open any cell doors. Appellant then offered to disclose everything that happened in L–6 if he was given total immunity and would not have to testify against inmates in L–6.

On January 18, 1994, Brink interviewed appellant again and told him that, at that time, he was not going to be given any type of immunity. Brink then offered more information about what they knew occurred in L–6, and appellant then told him that he was in L–6 at the console, that he did not open any cell doors, but that he told the person behind him which cells to open upon request of the death squad. Appellant also told Brink that he was in fear, but he never said of whom. Brink also testified that, when appellant was asked why he stopped the death squad's actions at Trocadoro's cell, appellant terminated the interview.

Appellant objected to this testimony on the basis that he did not testify, there had been no prior evidence that appellant made a statement to the highway patrol and it did not rebut anything appellant presented in his case-in-chief. Appellant's counsel also asserted that the entire decision not to have appellant testify was based on the fact that this statement did not come out in the state's case and they did not bring it up during their case.

The purpose of rebuttal is to permit the state the opportunity to refute new evidence offered by the defendant in the presentation of his case.

*State v. Moore* (1973), 47 Ohio App.2d 181, 1 O.O.3d 267, 353 N.E.2d 866; *State v. Hohman* (1991), 81 Ohio App.3d 80, 610 N.E.2d 473. A party has an unconditional right to present rebuttal testimony on matters which are first addressed in his opponent's case-in-chief. *Phung v. Waste Mgt., Inc.* (1994), 71 Ohio St.3d 408, 644 N.E.2d 286. It is error for a court to deny a plaintiff the right to explain or rebut testimony concerning a material issue which is introduced for the first time during the defendant's case-in-chief. *Katz v. Enzer* (1985), 29 Ohio App.3d 118, 29 OBR 133, 504 N.E.2d 427.

A trial court has broad discretion in the admission or exclusion of evidence, and its judgment will not be reversed absent a clear showing of an abuse of discretion with attendant material prejudice to the defendant. *State v. Hymore* (1967), 9 Ohio St.2d 122, 38 O.O.2d 298, 224 N.E.2d 126. In reviewing the trial court's admission or exclusion of evidence, this court must limit its review to whether the trial court's decision was unreasonable, arbitrary or unconscionable. *State v. Finnerty* (1989), 45 Ohio St.3d 104, 543 N.E.2d 1233.

The state asserts that the rebuttal evidence refuted the testimony of Moss, who stated that appellant was not in L–6 when the murders occurred, and the testimony of Jackson and Elmore, who stated that they heard Gordon threaten appellant and order him to man the console. The state asserts that Brink's testimony shows that the testimony of these three witnesses is contrary to the information appellant provided to the highway patrol and, therefore, it was proper rebuttal testimony so as to impeach the credibility of those witnesses.

In this case, the rebuttal testimony offered by the state did not refute any new evidence offered by appellant in the presentation of his case. The state, in its case-in-chief, presented evidence to show that appellant was at the console at the time the murders occurred and that he was the person who opened the cell doors for the Lamar group to give them access to various inmates. Appellant, in his case-in-chief, presented evidence to show that appellant was either not in control of the console at the time of the killings, was at the console under threat, or was not in the area at all. The fact that appellant gave a statement to the highway patrol was not addressed by either side, nor did appellant testify, so he could not have said something contrary to this statement.

This court finds that the admission of Brink's testimony on rebuttal was improper; however, this court also finds that the admission of this testimony by the trial court did not prejudice appellant. Brink's testimony did not add to or negate any other evidence that was already before the jury. As stated previously, there were many inconsistencies in the testimony of various witnesses, both for the state and for appellant. The resolution of the inconsistent testimony was for the trier of fact. Brink's testimony simply added another inconsistency for the jury, which was not very different from the evidence it had previously heard.

Therefore, even though Brink's testimony should not have been admitted, this court finds that appellant was not prejudiced by its admission. Appellant's fifth assignment of error is overruled.

In his seventh assignment of error, appellant asserts that the trial court erred in overruling his motion to dismiss the indictment on the ground that it was deficient as a matter of law. Appellant asserts that the indictment was deficient because he was not provided with proper notice of the particular conduct that allegedly constituted the aggravated murder charges. This prevented appellant from preparing and presenting a meaningful defense and failed to ensure that appellant was tried on the specific facts presented to and found by the grand jury.

In *State v. Sellards* (1985), 17 Ohio St.3d 169, 170, 17 OBR 410, 411, 478 N.E.2d 781, 783–784, the court stated:

" * * * The purpose of an indictment is twofold. By compelling the government to aver all material facts constituting the essential elements of an offense, an accused is afforded with adequate notice and an opportunity to defend. * * * An indictment, by identifying and defining the offense, also enables an accused to protect himself from any future prosecutions for the same offense."

The court then stated that an indictment is generally sufficient if it contains, in substance, a statement that the accused has committed some public offense which is specified in the indictment. The court then noted that a certain degree of inexactitude of averments, where they relate to matters other than the elements of the offense, is not *per se* impermissible or necessarily fatal to prosecution under an indictment.

Appellant directs us to *Russell v. United States* (1962), 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240, and *Headley,* 6 Ohio St.3d 475, 6 OBR 526, 453 N.E.2d 716, in support of his contention that the indictment in this case should have been dismissed.

In *Russell,* the defendants were prosecuted for refusing to answer questions before a congressional subcommittee. The court addressed an indictment returned by the grand jury which failed to identify the subject matter under congressional subcommittee inquiry at the time the witness was questioned. Instead, the indictment generally stated that the questions to which answers were refused were pertinent to the question being addressed by the subcommittee. The court found that the subject matter under inquiry was pertinent to prosecution under the statutes at issue,[8] as the very core of criminality under the statutes depended on the questions which the defendant refused to answer. The

---

8. The statutes at issue were Sections 192 and 194, Title 2, U.S.Code.

court, quoting *United States v. Carll* (1881), 105 U.S. 611, 612, 26 L.Ed. 1135, 1135, stated:

" \* \* \* 'In an indictment upon a statute, it is not sufficient to set forth the offence in the words of the statute, unless those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements · necessary to constitute the offence intended to be punished \* \* \* ' \* \* \*." 369 U.S. at 765, 82 S.Ct. at 1047, 8 L.Ed.2d at 251.

The court found that, in this case, the indictment was deficient because it did not even purport to inform the defendant in any way of the identity of the topic under inquiry by the subcommittee.

In *Headley,* the original indictment charging the defendant with aggravated trafficking, in violation of R.C. 2925.03(A)(8), omitted the identity of the controlled substance involved. After the defendant moved to dismiss the indictment, the trial court permitted the indictment to be amended to include the identity of the controlled substance: cocaine. The Supreme Court held that, because R.C. 2925.03 sets forth more than one criminal offense, each of which is distinguished by the type of controlled substance involved, the type of controlled substance at issue constitutes an essential element of the crime which must be included in the indictment. Therefore, if the type of controlled substance is omitted from the indictment, that information cannot be cured by amendment because it would change the identity of the offense charged. Thus, the indictment was defective and could not be cured by the court since doing so would permit the court to convict the accused on a charge that was essentially different from that found by the grand jury.

This court finds that both *Russell* and *Headley* are distinguishable from the case before us, as *Russell* and *Headley* involved situations where the specificity of the subject matter involved constituted an element of the offense. Therefore, it was imperative that the indictment state with particularity the subject matter involved, otherwise the indictment was deficient.

In this case, the particular conduct involved in the commission of the crime is not an element of the offense of aggravated murder. Instead, in order to prove aggravated murder, the prosecution needs to show that an individual purposely, and with prior calculation and design, caused the death of another individual. The indictment in this case charges appellant with purposely and with prior calculation and design causing the deaths of two individuals, Depina and Staiano, on or about April 11, 1993 in Scioto County, Ohio. The specificity in the indictment protects appellant from further prosecutions for the murders of Depina and Staiano and gave him adequate notice of the conduct involved and an opportunity to defend himself against the charges. Appellant then received more

detailed information when he requested a bill of particulars. While it is true that a bill of particulars cannot save a defective indictment, *Russell,* the purpose of a bill of particulars is to elucidate or detail the conduct of the accused which is alleged to constitute the charged offense. *Sellards,* 17 Ohio St.3d 169, 17 OBR 410, 478 N.E.2d 781. See, also, *State v. Fowler* (1963), 174 Ohio St. 362, 22 O.O.2d 416, 189 N.E.2d 133. In fact, the bill of particulars is where the prosecutor is to disclose the manner or means by which the death was caused. See, *e.g., State v. Petro* (1947), 148 Ohio St. 473, 36 O.O. 152, 76 N.E.2d 355.

In this case, this court finds that the indictment was sufficient since it charged conduct which, if proved, would constitute the offense. See Crim.R. 7, R.C. 2941.05 and 2941.03. It also afforded appellant the protections provided in Section 10, Article I of the Ohio Constitution and the Sixth Amendment to the United States Constitution. Therefore, the trial court did not err in overruling appellant's motion to dismiss. Appellant's seventh assignment of error is overruled.

Based on the foregoing, appellant's seven assignments of error are overruled, and the judgment of the trial court is affirmed.

*Judgment affirmed.*

PETREE, P.J., and PEGGY BRYANT, J., concur.