[Cite as *State v. Paige*, 2019-Ohio-1088.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## MAHONING COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

MICHAEL PAIGE,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 17 MA 0033**

---

Criminal Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 2012 CR 224

**BEFORE:**
Cheryl L. Waite, Gene Donofrio, Carol Ann Robb, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Paul J. Gains*, Mahoning County Prosecutor and *Atty. Ralph M. Rivera*, Assistant Prosecuting Attorney, 21 West Boardman Street, 6th Floor, Youngstown, Ohio 44503, for Plaintiff-Appellee

*Atty. Louis M. DeFabio*, 4822 Market Street, Suite 220, Youngstown, Ohio 44512, for Defendant-Appellant.

Dated: March 25, 2019

---

**WAITE, P.J.**

**{¶1}** Appellant Michael Paige appeals a January 12, 2017 Mahoning County Common Pleas Court judgment entry in which he was found guilty of murder with a gun specification and tampering with evidence. While the instant direct appeal was pending, Appellant filed a motion for resentencing, which we construed as a motion for postconviction relief. *State v. Paige,* 7th Dist. No. 17 MA 0146, 2018-Ohio-2782. At the initial sentencing hearing, the trial court failed to properly impose postrelease control. The trial court was required to notify Appellant that he was subject to a discretionary term of three years of postrelease control at the sentencing hearing and in the judgment entry. *State v. Grimes,* 151 Ohio St.3d 19, 2017-Ohio-2927, 85 N.E.3d 700, ¶ 1; *Paige* at ¶ 32. We remanded the matter for a limited resentencing on the issue of postrelease control. A resentencing hearing was held on December 10, 2018. No transcript of these proceedings are a part of the record. However, in an amended judgment entry of sentence dated December 14, 2018, the trial court noted that Appellant's prison term is to be followed by a discretionary period of postrelease control of up to three years. (12/14/18 J.E.) Appellant has filed no motions relative to his resentencing nor has he assigned error to the sentence imposed while his direct appeal was still pending. The issues raised on appeal deal only with his underlying convictions.

**{¶2}** On appeal, Appellant asserts that a violation of the Sixth Amendment Confrontation Clause occurred when investigating detectives testified regarding statements made by a codefendant who did not testify. Appellant alleges prosecutorial misconduct for eliciting the testimony and allowing witnesses to vouch for the credibility of the codefendant. Appellant also claims ineffective assistance of trial counsel on several grounds: failing to object to the prosecutorial misconduct, allowing admission of

inadmissible testimony, and failure to file a motion to suppress. Appellant also claims cumulative error occurred and that his Sixth Amendment right to a speedy trial was violated. Our review of this record shows that Appellant's arguments have no merit and we affirm the judgment of the trial court.

<u>Factual and Procedural History</u>

{¶3} Appellant's conviction stems from an incident that occurred on or around March 1, 2012. Munir Blake ("Blake") resided on the first floor of a duplex with his wife and five children. Jasmin Fletcher ("Fletcher") lived on the second floor of the duplex. Blake and Fletcher engaged in a verbal exchange the day prior to the incident because Blake recently discovered that Fletcher had run an extension cord from her second floor apartment to the basement in order to tap into his electrical line. She no longer had service and was in the process of moving out of her apartment. On the day of the incident, two of Blake's children, a son and daughter ages 9 and 11, walked home from school and entered their apartment. Blake's son watched television while his daughter went to her room. Blake was sleeping in his own room, because he was unwell. He emerged a short time later to check his electrical line and make sure that Fletcher had not plugged an extension cord into his outlet again. After Blake left the apartment, his children both heard him argue with two other individuals. The son said he recognized only his father's voice. The daughter said she recognized her father's voice, Fletcher's voice and a third, unknown individual. At trial she testified this voice "was high pitched and it sounded like a woman." (1/3/17 Tr., p. 196.) Blake's son testified that he could see his father in the doorway between the kitchen and the back stairwell. (1/3/17 Tr., p. 162.) He also testified that he could hear his father arguing that his electric bill was "sky high" because of

Fletcher. This was followed by one of the other individuals saying they were going to get a gun. (1/3/17 Tr., p. 165.) Blake's daughter testified that she heard the unknown voice say, "I will shoot you right now." (1/3/17 Tr., p. 197.) She also heard Fletcher say, "that's five dollars down the drain; you cut my cord." (1/3/17 Tr., p. 207.) Both children said they heard someone run upstairs and then back down while their father continued arguing. Then they both heard multiple gunshots and Blake's son ran out of the apartment. He turned around to get his sister, and they saw their father lying on the ground. Both children ran out of the building to a neighbor's home. (1/3/17 Tr., pp. 167-168.) Blake's son testified that he saw Fletcher standing outside of their duplex near the front porch moments after the shooting occurred. (1/3/17 Tr., p. 172.)

{¶4} Police and an ambulance were called. Officer Anthony Marzullo ("Marzullo") responded for the Youngstown Police Department. He recovered seven spent shell casings, all from a .45 caliber gun. He also recovered five bullets from the scene. All casings and bullets were found in the area of the back landing near the kitchen. (1/3/17 Tr., p. 228.)

{¶5} Dr. Joseph Ohr, Mahoning County Deputy Coroner, responded to the scene and later performed the autopsy on Blake. He testified that Blake suffered nine gunshot wounds. He testified the entry wounds were consistent with an individual firing from an elevated position on the stairs. (1/3/17 Tr., p. 277.)

{¶6} Youngstown Detective Sergeant Rick Spotleson ("Det./Sgt. Spotleson") was assigned as lead investigator to Blake's murder. Detective Sergeant Daryl Martin ("Det./Sgt. Martin") assisted Det./Sgt. Spotleson in the investigation. At trial, Det./Sgt. Spotleson testified that during the investigation he learned of the prior confrontation

between Blake and Fletcher regarding her use of Blake's electricity. (1/3/17, Tr., p. 305.) He observed an extension cord that extended down the steps from the second floor to the basement, and that a phone charger was connected to it in Fletcher's apartment. (1/3/17 Tr., p. 306.) After interviewing witnesses, including the children, Fletcher became a person of interest. She was arrested and interviewed by Det./Sgt. Spotleson several hours after the shooting. (1/3/17 Tr., p. 312.) Det./Sgt. Spotleson revealed at trial that this interview lead to Appellant:

Q And you interviewed [Fletcher]?

A Yes

Q Did she tell you that she was present when this occurred?

A Yes

Q Did she identify a second person of interest?

A Yes

Q And who was that?

A Michael Paige

{¶7} Det./Sgt. Spotleson testified he then concluded Appellant was a person of interest, and obtained a home address for Appellant. Late in the evening of the incident, police went to the address and found Appellant and his girlfriend. Det./Sgt. Spotleson obtained consent to search the residence. A .45 caliber firearm magazine clip was recovered from the scene. These bullets were consistent with the casings found at the murder scene. (1/3/17 Tr., p. 314.)

{¶8} Appellant was not placed under arrest at the conclusion of the search. However, Appellant and his girlfriend agreed to come to the station to give statements.

Case No. 17 MA 0033

The interview took place at approximately 1:20 a.m. on the day after the incident. During Appellant's interview with Det./Sgts. Spotleson and Martin he gave several different accounts of his role in the incident. Det./Sgt. Spotleson testified at trial that Appellant first said that he saw Fletcher during the day to help her repair her car but did not see her that night and was not at her apartment. (1/3/17 Tr., p. 316.) Appellant then told officers that he was at Fletcher's apartment on the night of the incident but was outside on his phone, and when he heard gunshots, he left. (1/3/17 Tr., p. 317.) Appellant's third version was that he had been in Fletcher's apartment helping her move. He remained in the apartment while Fletcher went downstairs. He heard her engage in an argument, heard gunshots, and then Fletcher ran upstairs to the apartment yelling "let's go, let's go." (1/3/17 Tr., p. 317.)

{¶9} Det./Sgt. Spotleson testified that at the end of the interview he did not believe he had enough evidence to arrest Appellant. (1/3/17 Tr., p. 318.) A gunshot residue test was performed on Appellant, but the results were negative.

{¶10} At approximately 8:40 a.m. the following morning, Det./Sgts. Spotleson and Martin again interviewed Fletcher. They showed Fletcher the video recording of Appellant's interview. On direct examination, Det./Sgt. Spotleson testified to the following:

Q After you showed her the portion of the interview with the defendant did she change her statement?

A Yes.

Q In the second statement she gave did she tell you who the shooter was?

A Yes.

Q Did she tell you where the shooter was standing?

A Yes.

Q Did she tell you where she was standing?

A Yes.

Q And where the victim was standing?

A Yes.

Q Based on your assessment of the scene, your conversations with Dr. Ohr and what she had told you, what Jasmin Fletcher told you, did that make sense to you?

A Yes.

Q At the end of the interview did you have a suspect?

A Yes.

Q Who was that suspect?

A That suspect was Michael Paige.

(1/3/17 Tr., pp. 320-321.)

{¶11} Det./Sgt. Spotleson also testified on direct regarding the second Fletcher interview:

Q Did she talk about -- did you discuss with her whether or not [Blake] had a gun?

A Yes.

Q Did he have a gun?

A No.

Case No. 17 MA 0033

Q  All right.  Did you discuss with her whether or not she was threatened by Mr. Blake?

A  Yes.

Q  Was she?

A  No.

(1/3/17 Tr., p. 329.)

{¶12} Appellant was arrested that day and brought to the Youngstown Police Department.  After being read his *Miranda* warnings, he gave another statement to Det./Sgts. Spotleson and Martin.  A video recording of the interview was admitted into evidence at trial.  Det./Sgt. Spotleson testified on direct that Appellant initially repeated that Fletcher was the shooter.  This was his third version of the story from his earlier interview.  Appellant eventually admitted, however, that he shot Blake:

Q  Was there a time when finally he told you that he did it?

A  Yes.

Q  Did he tell you—when he told you that did he tell you where the victim was standing?

A  Yes.

Q  Did he tell you where Jasmin Fletcher was standing?

A  Yes.

Q  Did he tell you where he was standing?

A  Yes.

Q  And was that consistent with what Jasmin Fletcher had told you and with what Dr. Ohr -- what his findings were?

A Yes.

(1/3/17 Tr., p. 324.)

**{¶13}** At trial, both Det./Sgts. Spotleson and Martin testified that Appellant admitted in the final interview that he shot Blake. (1/3/17 Tr., pp. 324, 418.) At the end of this interview Det./Sgts. Spotleson and Martin left the room. Appellant's girlfriend was allowed into the interview room and Appellant was allowed to speak to her. The entire encounter, including Appellant's interview with the detectives and the conversation between Appellant and his girlfriend, was recorded and later played at trial. (1/3/17 Tr., p. 325.)

**{¶14}** Appellant was indicted on March 8, 2012, on one count of aggravated murder in violation of R.C. 2903.01(A), (F), an unclassified felony; with a firearm specification in violation of R.C. 2941.145(A); one count of murder in violation of R.C. 2903.02(A), (D), an unclassified felony, with a firearm specification in violation of R.C. 2941.145(A); two counts of tampering with evidence in violation of R.C. 2921.12(A)(1), (B), felonies of the third degree; and one count of obstructing justice in violation of R.C. 2921.32(A)(5), (C)(4), a felony of the third degree.

**{¶15}** Appellant was arraigned on March 13, 2012. Court-appointed defense counsel filed a motion on September 17, 2012, seeking to suppress statements made by Appellant to police. In this motion counsel argued that the *Miranda* warnings were cursory in nature and Appellant was under the influence of drugs at the time the statements were given. A hearing on the motion to suppress was held and the motion was overruled by the trial court in a judgment entry dated October 25, 2012.

{¶16} Jury trial commenced on February 24, 2014. The jury found Appellant not guilty of aggravated murder. This jury was unable to reach a unanimous verdict on the remaining charges, however, so in a judgment entry dated March 4, 2014, the trial court declared a mistrial on these charges and discharged the jury.

{¶17} New counsel was appointed. Appellant filed a *pro se* motion attempting to revoke his previously executed waiver of the right to a speedy trial. His newly appointed counsel raised the issue of his competency to stand trial on August 6, 2015. A hearing on Appellant's competency was held on October 5, 2016 and the trial court ultimately concluded Appellant was competent to stand trial.

{¶18} A second jury trial commenced on January 11, 2016. In a judgment entry dated January 13, 2016, the trial court *sua sponte* declared a mistrial after the jury was empaneled, because Appellant filed a *habeas corpus* proceeding naming the assistant prosecuting attorney as a defendant in the United States District Court for the Northern District of Ohio.

{¶19} Ultimately, a jury trial in this matter took place on January 3, 2017. The state presented the testimony of several witnesses, including Det./Sgts. Spotleson and Martin. Both the state and defense counsel subpoenaed Fletcher as a witness. However, Fletcher failed to appear and a material witness warrant was issued. While Fletcher appeared pursuant to this warrant, the state rested without testimony from Fletcher. Appellant did call Fletcher as a witness. Fletcher appeared and asserted her Fifth Amendment privilege against self-incrimination and refused to testify. (1/3/17 Tr., pp. 388-389.) A discussion ensued about whether Fletcher was able to assert a Fifth Amendment right. The discussion included statements from Fletcher's counsel, who was

present in the courtroom. The trial court concluded that, as Fletcher had entered a guilty plea for her part in the crime but had not yet been sentenced, she retained her right to invoke the privilege. The trial court reasoned that the incrimination inherent in her guilty plea was not complete without the sentence being imposed. (1/3/17 Tr., p. 390.) At the close of evidence, the trial court charged the jury not only as to murder, but on the lesser included offense of voluntary manslaughter. The jury returned a guilty verdict on the murder charge and the firearm specification, and also on the charge of tampering with the evidence.

{¶20} A sentencing hearing was held on January 24, 2017. The trial court sentenced Appellant to life imprisonment with parole eligibility after fifteen years for the murder conviction, three years for tampering with evidence to be served concurrently with the sentence imposed for murder, and three years for the firearm specification, to be served consecutively to the sentence imposed for the murder charge. Appellant filed this timely appeal.

ASSIGNMENT OF ERROR NO. 1

Testimony relating to out of court, testimonial statements, violated Appellant's constitutional right to confront witnesses as guaranteed by the Sixth Amendment to the United States Constitution and Art. I, Section 10 of the Ohio Constitution.

{¶21} Appellant contends the testimony of Det./Sgts. Spotleson and Martin regarding the statements Fletcher made to them during police interviews constituted testimonial hearsay in violation of his right to confront witnesses guaranteed by the Sixth Amendment Confrontation Clause.

**{¶22}** The state contends the testimony of Det./Sgts. Spotleson and Martin was for the purpose of explaining their conduct during the investigatory process and that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice.

**{¶23}** The trial court typically has broad discretion in admitting or excluding evidence. *State v. Sage,* 31 Ohio St.3d 173, 182, 510 N.E.2d 343, 350 (1987). However, a *de novo* standard of review is applied to a claim that a criminal defendant's rights have been violated under the Confrontation Clause. *State v. Mitchell,* 2016-Ohio-1439, 62 N.E.3d 820, ¶ 77 (7th Dist.).

**{¶24}** Pursuant to the Sixth Amendment Confrontation Clause, "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." Testimonial statements of a non-testifying witness are inadmissible unless the witness was unavailable to testify and the defendant had a prior opportunity for cross-examination of the witness. *Crawford v. Washington,* 541 U.S. 36, 53-54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). In *Crawford,* the Supreme Court declined to provide a comprehensive definition of "testimonial," but indicated that the term includes, at a minimum, prior testimony at a preliminary hearing, before a grand jury, at a former trial, and statements made during police interrogations. *Id.* at 68.

**{¶25}** In *Davis v. Washington,* 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), the Supreme Court held that statements are nontestimonial for Confrontation Clause purposes when made in the course of a police interrogation under such circumstances that indicate objectively the primary purpose of the interrogation is to enable police to address an ongoing emergency. *Id.* at 822. Testimonial statements

occur when the circumstances objectively indicate that there is no ongoing emergency and the primary purpose of the interrogation is to establish or prove past events that are potentially relevant to a future criminal prosecution. *Id.* See, also, *State v. Siler,* 116 Ohio St.3d 39, 2007-Ohio-5637, 876 N.E.2d 534, paragraph two of the syllabus; *State v. Duncan,* 7th Dist. No. 16 NO 0440, 2017-Ohio-9378.

**{¶26}** Hence, we must distinguish between police interrogations that are part of an ongoing emergency and interrogations related to past criminal conduct and which serve only to investigate potential criminal prosecution. Appellant claims the testimony of two witnesses give rise to Confrontation Clause issues: the direct testimony of Det./Sgt. Spotleson and the direct testimony of Det./Sgt. Martin. Det./Sgt. Spotleson was lead investigator on the case and was assisted by Det./Sgt. Martin. Both were present during the interviews of Appellant and Fletcher.

**{¶27}** Det./Sgt. Spotleson provided most of the testimony to which Appellant objects. As noted above, during direct examination Det./Sgt. Spotleson was asked a number of questions regarding statements Fletcher made during her two interviews with police. At the outset it should be noted that, although the first interview was conducted on the same day as the incident, albeit several hours later, and the second interview was conducted the following morning, neither interview can be characterized as addressing an emergency situation. Fletcher was a person of interest during her first interview. At the conclusion of Fletcher's first interview, Appellant was also a person of interest. At the time of the second interview, both Fletcher and Appellant had been placed under arrest. In the absence of an ongoing emergency, the statements made by Fletcher to police were made under circumstances that objectively indicate there was "no such ongoing

emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Siler* at ¶ 24, quoting *Davis,* at 822.

**{¶28}** The state contends the testimony of the detectives was "offered to explain an officer's conduct while investigating a crime" and thus, are not hearsay and do not violate the Confrontation Clause. *State v. Blevins,* 36 Ohio App.3d 147, 149, 521 N.E.2d 1105 (10th Dist.1987). We do not find this reasoning persuasive, particularly when considering the testimony elicited from Det./Sgt. Spotleson regarding his first interview of Fletcher:

Q  And you interviewed [Fletcher]?

A  Yes

Q  Did she tell you that she was present when this occurred?

A  Yes

Q  Did she identify a second person of interest?

A  Yes

Q  And who was that?

A  Michael Paige

(1/3/17 Tr., p. 312.)

**{¶29}** In *State v. Ricks,* 136 Ohio St.3d 356, 2013-Ohio-3712, 995 N.E.2d 1181, the Ohio Supreme Court held that an officer's testimony regarding the out-of-court statements of an alleged accomplice identifying the defendant as the assailant violated the Confrontation Clause when the accomplice did not testify at trial. In *Ricks,* the officer testified regarding the process undertaken to obtain a photograph of the defendant as

Case No. 17 MA 0033

well as the act of presenting that photograph to the alleged accomplice during an interrogation of that accomplice. Following this explanation, the officer testified:

Q. Once again, [Officer], when you showed [the alleged accomplice] this photo, after obtaining it from Georgia, did he make identification?

A. Yes.

Q. What did he say?

A. He says that's Peanut.

*Id.* at ¶ 40.

{¶30} In contrast, in *State v. Johnson,* 8th. Dist. No. 105612, 2018-Ohio-1389, 110 N.E.3d 800, the investigating officer interviewed a witness named Wright. Wright invoked his Fifth Amendment privilege at the defendant's trial. During defendant's trial, the officer testified that Wright had given her a description of both the vehicle involved in the shooting and the shooter. During this testimony the officer did not repeat those descriptions. In fact, "[w]hen Officer Johnson began to offer hearsay testimony, the state and the court reminder her not to repeat what other people may have said." *Id.* at ¶ 38. The Eighth District held that since the officer did not testify as to the exact statements of Wright, there was no Confrontation Clause violation. The state also presented the testimony of the decedent's mother, Andrea, who had spoken to Wright about her son's death:

[STATE]: Why don't you tell us about the following day. Did you meet with [Wright]?

[ANDREA]: Yeah, the following day I guess he wanted to tell me who—

[DEFENSE COUNSEL]: Objection.

THE COURT:  Well, why don't we caution [Andrea].  One of the rules in court is that you can't tell us what somebody else said.

[STATE]:  We went over the rules a little bit before your testimony * * * about hearsay.  You can't talk about what someone else told you, right?  So I don't want you to say the words that [Wright] said, right?

[ANDREA]:  Right

* * *

[STATE]:  Did [Wright] tell you what happened?

[ANDREA]:  Yes.

[STATE]:  And without telling us what he said, did he tell you who had done it?

[ANDREA]:  Yes.

[STATE]:  Did he give you one name or more than one?

[ANDREA]:  He gave me [the] first and last name * * * of one person.

[STATE]:  Again, [Andrea], I don't want to go into specifics about what he said, but did he tell you how it happened and how [Ayers} died?

[ANDREA]:  Yes.

*Johnson* at ¶ 40.

**{¶31}** The Eighth District likewise held in regard to this testimony that since the actual information the witness had learned from Wright was not disclosed during testimony, the testimony was not offered to prove the circumstances of the decedent's death but only to explain how the case unfolded.  Hence, it was not testimonial hearsay.  *Id.* at ¶ 41.

{¶32} The line of questioning in the instant case more closely reflects the situation found in *Ricks*, and not *Johnson*, as Appellee claims. Rather than testifying only to Det./Sgt. Spotleson's "conduct while investigating a crime," the testimony goes further, eliciting testimony about the identification of Appellant by his codefendant. *Blevins* at 149. When testifying as to Fletcher's first interview, not only did Det./Sgt. Spotleson relate the questions he asked her, he testified that she gave the officer Appellant's name as a person involved in the crime. Regarding Fletcher's second interview, after she was shown the video of Appellant's interview implicating her as the shooter, Det./Sgt. Spotleson testified that Fletcher told him where she was standing, where the victim was standing and where the shooter was standing. He repeated those exact locations. He also testified that Fletcher told him Blake did not have a gun and that she did not feel threatened by Blake during the incident. (1/3/17 Tr., pp. 320-321, 329.) At the end of his questioning, Det./Sgt. Spotleson was asked whether he had a suspect at the conclusion of Fletcher's interview. He responded in the affirmative and named Appellant. This testimony goes beyond the process used in the investigation. It goes to the heart of the fact at issue, the name of the shooter. Although not as direct as the testimony revealed as a result of the first interview, and framed in a manner that appears to explain police conduct during an investigation, it is clear that Det./Sgt. Spotleson's testimony was offered to place before the jury Fletcher's statements implicating Appellant as the shooter, and not simply to demonstrate how the investigation was conducted.

{¶33} Det./Sgt. Martin testified as a witness for Appellant. He was called to testify regarding the search of Appellant's residence, which failed to elicit an actual weapon, as well as to Appellant's gun powder residue test results, which were negative. On cross-

examination, the state asked Det./Sgt. Martin about Appellant's admission that he shot Blake and whether Appellant's admission mirrored what Fletcher said about the crime scene:

Q  He also told you that he killed Munir Blake, correct?

A  Correct.

Q  And did [Fletcher] corroborate that?

A  Yes.

Q  He told you that [Blake] was standing that doorway—and just so you know, the jury went to the scene, so they have seen that.  The doorway going from the kitchen onto that landing, stairway landing, he also told you that [Blake] was standing in that doorway, correct?

A  Correct.

Q  And did [Fletcher] corroborate that?

A  Yes.

Q  He also told you that [Fletcher] would have been pretty much facing [Blake], correct?

A  Correct.

Q  Standing on that landing, basically pretty much straight across from each other?

A  He described face to face.

Q  Okay.  And [Fletcher] also corroborated that, correct?

A  Correct.

* * *

Q  To the best of your knowledge, did [Fletcher] ever say that she shot and killed [Blake]?

A  No.

(1/3/17 Tr., pp. 418-419.)

**{¶34}** Again, rather than testifying only to Det./Sgt. Martin's "conduct while investigating a crime" the testimony goes further and seeks to place before the jury that Fletcher corroborated Appellant's admission. *Blevins* at 149. As Fletcher did not testify, the state used the officer's testimony to put Fletcher's statements into evidence. Under the primary purpose test set forth in *Crawford* and its progeny, the statements made by Fletcher during her police interrogations are testimonial in nature. The testimony given by both officers goes beyond their investigatory conduct and procedure and instead appears to be an attempt to prove the truth of the matter asserted:  to identify Appellant as the assailant and to bolster Appellant's admission. As Fletcher did not testify at trial and there was no previous opportunity for Appellant to cross-examination Fletcher, this testimony was inadmissible hearsay in violation of the Confrontation Clause.

**{¶35}** Once we determine that the testimony was admitted erroneously, our inquiry does not end here, however. We must next look at whether Appellant was harmed by this error. In *Ricks,* the Supreme Court held that statements made by the officer were unfairly prejudicial and the cited purpose for the testimony, police investigatory procedure, was pretextual. *Ricks* at ¶ 34, 45. The *Ricks* Court found the out-of-court statements "exceptionally damaging" because the declarant was the other suspect in the murder. As most of the state's evidence related to the other suspect's involvement in the crime, the state's case, then, "revolved" around the declarant. *Id.* at ¶ 36. The *Ricks* Court

concluded the Confrontation Clause violation was not harmless beyond a reasonable doubt as there existed a reasonable possibility that the testimony of the officer contributed to the defendant's conviction. *Id.* at ¶ 47. Whether a Confrontation Clause violation is harmless beyond a reasonable doubt involves not merely an inquiry into the sufficiency of the remaining evidence, absent the erroneously admitted evidence, but whether there is a reasonable possibility that the violating evidence might have contributed to the resulting conviction. *Id.* at ¶ 46, citing *Chapman v. California,* 368 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

**{¶36}** Regarding harmless error, Crim.R. 52(A) provides that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." See also Evid.R. 103(A) (error may not be predicated on a ruling which admits or excludes evidence unless a substantial right of the party is affected and a timely objection was made.) In order to determine whether substantial rights were affected, we must evaluate whether there was prejudice to the defendant. *State v. Morris,* 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 23, 27. A court is required to review the impact of the offending evidence on the overall verdict and compare it to the strength of the other remaining evidence. *Id.* at ¶ 25.

**{¶37}** To determine "whether a new trial is required or the error is harmless beyond a reasonable doubt, the court must excise the improper evidence from the record and then look to the remaining evidence." *Morris* at ¶ 29. Moreover, "the cases where imposition of harmless error is appropriate must involve either overwhelming evidence of guilt or some other indicia that the error did not contribute to the conviction." *State v.*

*Rahman,* 23 Ohio St.3d 146, 151, 492 N.E.2d 401 (1986), quoting *State v. Ferguson,* 5 Ohio St.3d 160, 166, 450 N.E.2d 265 (1983), fn. 5.

**{¶38}** The fact that most concerned the *Ricks* Court was that the declarant who was the subject of the officer's testimony was an accomplice, and the state's evidence centered predominately around the accomplice. In the instant case, Fletcher is also a codefendant. The same concern over utilizing the testimonial statements of a codefendant is theoretically applicable here. Both investigating detectives testified about statements made by Fletcher which placed Appellant at the scene as the shooter. In urging prejudice under the plain error standard, Appellant alleges that although he confessed to shooting Blake, the record reflects that he told several different accounts of the events that transpired. The testimony of Det./Sgts. Spotleson and Martin had the effect of bolstering his admission, by corroborating the details of the version of events (including Appellant's own) that reflect Appellant's guilt.

**{¶39}** While we are troubled by the admission of the testimony of Det./Sgts. Spotleson and Martin because the testimony went beyond what is allowable by law, the troubling nature of the testimony is considerably lessened when considering the remaining evidence presented to the jury. Excising the testimony of Det./Sgts. Spotleson and Martin, which we are required to do, this record reveals that the jury had before it overwhelming evidence of Appellant's guilt. First and foremost, the jury was shown the videotaped admission of the shooting by Appellant, where he provided a detailed description of the murder scene and of the events in his own words. His description of the incident was corroborated by the testimony of Officer Anthony Marzullo who investigated the scene. It was further corroborated by Dr. Ohr, the medical examiner who

not only investigated at the scene but performed the autopsy on Blake. Further, the jury was taken to the scene of the shooting in order to better visualize the testimony presented regarding the placement of the shooter in relation to the gunshot wounds suffered by Blake. We cannot discount the inherent significance of the video confession, where the jury was able to see Appellant confessing to the crime and describing the scene in detail. Nor can we second-guess the jury's credibility determinations in that regard. *State v. Hill,* 75 Ohio St.3d 195, 205, 661 N.E.2d 1068 (1996). The erroneous testimony regarding Fletcher's statements was merely cumulative to testimony already presented by Dr. Ohr, Officer Marzullo and, most notably, Appellant himself.

**{¶40}** On review of this record, we conclude that, in view of the particular facts and circumstances of this case, any error in the hearsay admission of Fletcher's statements was harmless beyond a reasonable doubt. We stress that we reach this conclusion based on the other overwhelming evidence of Appellant's guilt, most notably Appellant's own detailed videotaped confession, but also the testimony of the other witnesses, as well as the remaining relevant testimony of both Det./Sgts. Spotleson and Martin. Based on this record, the cumulative nature of the officers' testimony was neither impactful nor prejudicial. Excising that testimony and considering the remaining evidence presented, the state proved beyond a reasonable doubt that Appellant was the shooter. We caution that it is the nature and amount of other relevant evidence that clearly impacts our review of this matter. Absent the overwhelming evidence of guilt present in this record, the testimonial hearsay evidence would most likely not be harmless. Based on the record in this matter, Appellant's first assignment of error is without merit and is overruled.

Case No. 17 MA 0033

ASSIGNMENT OF ERROR NO. 2

The Appellant was denied a fair trial, as guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, Sections 1, 10 and 16 of the Ohio Constitution, due to repeated instances of prosecutorial misconduct, including having the police vouch for the credibility and truthfulness of Jasmin Fletcher's out of court statements, for eliciting testimony regarding the out of court statements and for calling Fletcher's attorney and introducing evidence regarding her plea of guilty and the reasons for her assertion of her Fifth Amendment privilege.

**{¶41}** In his second assignment of error, Appellant asserts multiple instances of prosecutorial misconduct occurred which deprived him a fair trial.  Appellant again refers to the testimony of Det./Sgts. Spotleson and Martin that recounts Fletcher's statements, reference to Fletcher's statements by the state during closing argument, and the state's decision to call Fletcher's attorney as a rebuttal witness in this case.

**{¶42}** Regarding the testimony of Det./Sgts. Spotleson and Martin, Appellant contends both officers improperly vouched for Fletcher's credibility.  During this testimony the state asked both whether the statements made by Fletcher were corroborated by the findings of the medical examiner and were corroborated by other information regarding the scene of the incident.  (1/3/17 Tr., pp. 320, 418-419.)

**{¶43}** In determining whether prosecutorial misconduct has occurred, we must determine whether the comments or questions were improper and, if they were, whether they prejudiced Appellant's substantial rights.  *State v. Treesh,* 90 Ohio St.3d 460, 480, 2001-Ohio-4, citing *State v. Lott,* 5 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990).  The

Case No. 17 MA 0033

benchmark of this analysis is "the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips,* 455 U.S. 209, 212, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). Vouching for a witness occurs when, "the prosecutor implies knowledge of facts outside the record or places his or her personal credibility in issue." *State v. Davis,* 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 232.

**{¶44}** In *State v. Huff*, 145 Ohio App.3d 555, 763 N.E.2d 695 (1st Dist.2001), relied on by Appellant, the First District reversed a conviction for felonious assault and concluded a defendant was denied a fair trial when the prosecutor elicited testimony from a detective about whether he thought the victims in the matter were credible. The prosecutor in *Huff* asked the detective whether he thought there was any doubt about the victims' identification of the shooter. There was no objection by defense counsel and the detective responded that he absolutely found the victims credible and that they were telling the truth.

**{¶45}** As in *Huff,* defense counsel did not object to the testimony of Det./Sgts. Spotleson and Martin regarding Fletcher's statements, thus waiving all but plain error. *State v. Childs,* 14 Ohio St.2d 56, 236 N.E.2d 883 (1968), paragraph three of the syllabus. As earlier discussed, Det./Sgts. Spotleson and Martin testified that the statements made by Fletcher corroborated the findings already made in their investigation as well as those of Marzullo, who had investigated the scene, and of Dr. Ohr, the medical examiner. Testifying about whether witness statements match other findings of an investigation is not akin to vouching for that witness' credibility. No improper vouching occurs so long as the prosecutor or the witness does not express any personal belief about another witness' credibility. *Davis,* at ¶ 241. While improper on other grounds, there was no improper

vouching for the credibility of the declarant, here. Neither Det./Sgts. Spotleson nor Martin testified that they found Fletcher credible. Simply because information she gave was consistent with another witness' findings is not improper vouching.

**{¶46}** Appellant also contends the prosecutor relied on Det./Sgts. Spotleson and Martin's testimony and their allegedly vouching for Fletcher's credibility during closing argument by stating:

> There were three people there that afternoon. Three people in that stairwell. Unfortunately, probably the best person of the three isn't here to tell us what happened, the other two are. Jasmin Fletcher and Michael Paige both told the police what happened. They both said where everybody was standing and they both said who fired the shots.

(1/3/17 Tr., pp. 444-445.)

**{¶47}** Again, while the statements of Fletcher were improperly submitted on other grounds, no vouching occurred here. The state was recounting the testimony at trial, including that Appellant's version of the incident in his admission matched what Fletcher told the officers. However, the prosecutor neither implied knowledge of facts outside of the record nor placed his personal credibility at issue by making such argument and again, if we remove any reference to Fletcher and her statements, as we must, the state's observation that Appellant's confession contained all the relevant information necessary to find guilt appears accurate. Further, since the jury could actually witness Appellant confessing to the crime and could accurately judge his credibility for themselves, mention of the improperly admitted Fletcher statements cannot be error in this instance. *State v. Keene,* 81 Ohio St.3d 646, 666, 693 N.E.2d 246. Thus, no plain error is present.

**{¶48}** Finally, Appellant alleges prosecutorial misconduct when the state called Fletcher's counsel, Attorney Kivlighan, as a rebuttal witness in relation to Fletcher's assertion of her Fifth Amendment privilege. The admission of rebuttal testimony is left to the discretion of the court. *State v. Finnerty,* 45 Ohio St.3d 104, 106, 543 N.E.2d 1233 (1989). The purpose of a rebuttal witness is to allow the state to refute new evidence offered by the defendant in the presentation of his case. *State v. Talley,* 7th Dist. No. 97 CA 72, 1998 WL 811347, *5, citing *State v. Grinnell*, 112 Ohio App.3d 124, 146, 678 N.E.2d 231 (10th Dist.1996). Evidence that is merely cumulative and that does not contradict or refute evidence presented in the opposing party's case-in-chief is not proper rebuttal evidence. *State v. Hawn,* 138 Ohio App.3d 449, 470, 741 N.E.2d 594 (2nd Dist.2000) citing *State v. Wood,* 11th Dist. No. 95-P-0009, 1996 WL 649132. However, when the evidence contradicts the opposing party and also happens to bolster the state's case-in-chief it is not inappropriate. *State v. Owens,* 2nd Dist. Nos. 14068, 93-CR-214, 1994 WL 683395 (1994) *7.

**{¶49}** The matter of whether Fletcher was able to assert her Fifth Amendment privilege against self-incrimination when called as a defense witness in this case was discussed at length on the record before the jury. While Fletcher initially failed to appear in this matter, Appellant called Fletcher as a witness after she appeared pursuant to a material witness warrant issued for her. Once Fletcher refused to testify, invoking the Fifth Amendment, defense counsel requested the court to instruct Fletcher to respond, arguing that she had no basis for invoking the privilege. (1/3/17 Tr., p. 389.) The court inquired as to the state's position, but the prosecutor left the matter to the trial court's discretion. The court then inquired of Fletcher's attorney, Attorney Kivlighan, who was

present in the courtroom, about the basis of Fletcher's claims to privilege. Citing *Mitchell v. United States,* 526 U.S. 314, 119 S.Ct. 1307 (1998), paragraph one of the syllabus, Kivlighan responded that although Fletcher had pleaded guilty to her role in the matter, she had not been sentenced. Therefore, absent sentencing pursuant to her plea, her incrimination was not complete. (1/3/17 Tr., p. 390.) The trial court ruled that Fletcher could assert her Fifth Amendment rights and refuse to testify. (1/3/17 Tr., pp. 390-391.) As the matter appeared to be settled, the defense called its next witness. At the close of the defense's case, the trial court asked the state to call their rebuttal witness and Atty. Kivlighan testified, in pertinent part:

Q Through your practice, do you represent a woman by the name of Jasmin Fletcher?

A I do.

Q And you were present this morning when she came in and took the Fifth Amendment when she was called to testify, correct?

A That's correct.

Q You're representing her in the criminal matters that occurred out of this incident, correct?

A That's correct.

* * *

Q Okay. Are you aware that she has entered pleas of guilty to tampering with evidence and obstructing justice?

A I'm aware of that, yes.

Q  And have you, on her behalf, filed a motion to vacate those pleas, or that plea?

A  Yes, that motion was filed.

Q  Okay.  And the effect of that, if that motion was granted, would mean she has not been found guilty, she would sit here, her case could go to trial, another plea agreement could be reached, it could be dismissed, but basically we are starting over from square one, basically?

A  Yes, if the motion was granted.

Q  Okay.  Based on the fact that that motion had been filed, the motion to vacate the plea, did you discuss with her -- and I am not asking what you discussed -- did you discuss with her the prospect of her testifying in this matter?

A  In conjunction with filing the motion, we did discuss whether or not she would testify in this matter.

[DEFENSE COUNSEL]  Judge, I'm going to object and can we approach the bench?

(1/3/17 Tr., pp. 437-439.)

{¶50} At this point, a discussion was had off the record and the trial court then sustained defense counsel's objection and the witness was excused.

{¶51} Citing *State v. Dinsio*, 176 Ohio St. 460, 469, 200 N.E.2d 467 (1964), Appellant contends the testimony of Atty. Kivlighan as a rebuttal witness was highly prejudicial and that the state was prevented from calling the rebuttal witness when it knew that Fletcher would assert her Fifth Amendment privilege.  In essence, Appellant contends

Case No. 17 MA 0033

the state used Kivlighan's testimony as a way to get highly prejudicial testimony before the jury when it could not get that direct testimony to the jury through Fletcher. In *Dinsio*, the Ohio Supreme Court held that a witness who has indicated he will not testify because he was invoking his Fifth Amendment right against self-incrimination cannot be called to testify and be subjected to continued questioning that goes unanswered in order to get evidence before a jury using innuendo or inferences. *Id.* at paragraph one of the syllabus. If such an attempt occurs, the trial court may instruct the jury to draw no conclusion from the witness' decision to invoke the privilege. *State v. Abdi,* 4th Dist. No. 09CA35, 2011-Ohio-3550, at ¶ 88.

**{¶52}** Contrary to Appellant's assertion, we do not find the rebuttal witness' testimony prejudicial to Appellant. If anything, placing Attorney Kivilighan on the stand as a witness could only serve to hurt the state's case. Fletcher invoked her Fifth Amendment privilege in front of the jury. This resulted in the codefendant in the case appearing to admit to a degree of culpability in the matter. By placing her attorney on the stand, the state now reminded the jury that Appellant's codefendant in the case invoked her privilege against self-incrimination. This scenario has the opposite effect of creating prejudice to Appellant, because it appears that it should only serve to create doubt as to Appellant's guilt.

**{¶53}** The state did not call Fletcher to testify although both parties had subpoenaed her as a witness. It was when the defense called her to testify that she invoked the privilege not to testify. It is not apparent from the record that the state had any prior knowledge that Fletcher would invoke her privilege. Regardless, defense counsel elected to call her as a witness and it was Appellant's counsel who questioned

Case No. 17 MA 0033

her ability to invoke the privilege. Therefore, the issue of whether Fletcher was able to invoke a Fifth Amendment privilege was raised by the defense and the state offered no objection or argument on the matter. It appears a discussion was had off the record after Fletcher was dismissed. There may have been a discussion concerning the use of a rebuttal witness, but as it was held off the record, this is purely speculation. The trial court asked the state to proceed with its rebuttal witness without any prior reference to such a witness in the record. Moreover, there was no initial objection to the state calling Fletcher's counsel on rebuttal. Counsel objected to the testimony only when questioning progressed to the issue of whether Fletcher would testify in the instant case. Atty. Kivlighan's testimony could be construed as cumulative as the issue of Fletcher's guilty pleas had been raised at the time she invoked her privilege. However, as his testimony also raised the status of those guilty pleas and the potential for her to go to trial on the offense charged, if it was error to allow this witness to testify, the testimony itself had no prejudicial effect on Appellant's trial. In fact, if it caused any harm this harm could only be on the state which had elected not to call Fletcher as a witness. The trial court did not abuse its discretion in admitting the rebuttal testimony nor did any prosecutorial misconduct occur. Appellant's second assignment of error is without merit and is overruled.

## ASSIGNMENT OF ERROR NO. 3

The Appellant received ineffective assistance of trial counsel when his trial attorney failed to failed to [sic] object to numerous instances of prosecutorial misconduct and the admission of clearly inadmissible hearsay statements

Case No. 17 MA 0033

and failed to file a motion to suppress statements made by Appellant, to his girlfriend, that were surreptitiously recorded by the police.

**{¶54}** In his third assignment of error, Appellant claims he received ineffective assistance of counsel when trial counsel failed to object to prosecutorial misconduct and the admission of hearsay, and failed to file a motion to suppress the conversation recorded between Appellant and his girlfriend after he admitted to being the shooter.

**{¶55}** In a claim for ineffective assistance of counsel, a reviewing court is highly deferential to trial counsel's strategy and must indulge in a strong presumption that counsel's performance fell within a wide range of reasonable professional assistance. *State v. Bradley,* 42 Ohio St.3d 136, 141-142, 538 N.E.2d 373 (1989). Appellant bears the burden of demonstrating that counsel's performance fell below an objective standard of professional competence. If successful in demonstrating that counsel committed professional error, the appellant must then demonstrate he was prejudiced by that deficiency. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**{¶56}** "Deficient performance" means performance falling below an objective standard of reasonable representation. *Strickland* at 687-688. "Prejudice" in this context, means a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Id.* at 694. Reversal as a result of prejudice from defective representation is justified only where the results are unreliable or the proceeding was clearly fundamentally unfair due to counsel's performance. *State v. Carter,* 72 Ohio St.3d 545, 558, 651 N.E.2d 965 (1995).

{¶57} "An ineffectiveness claim * * * is an attack on the fundamental fairness of the proceeding whose result is challenged." *Id.* at 697. An appellant's burden when challenging the effectiveness of counsel is to demonstrate that some action or inaction by counsel operated to undermine or call into question the integrity of the process that resulted in conviction. *State v. Calhoun*, 86 Ohio St.3d 279, 289, 714 N.E.2d 905 (1999).

{¶58} The testimony of both Det./Sgts. Spotleson and Martin was reviewed in Appellant's first assignment of error. The admission of the testimony was error, but resulted in no prejudice to Appellant, as the overwhelming evidence at trial supported Appellant's convictions. It is not enough that any error by counsel can be shown to have "some conceivable effect on the outcome of the proceeding." *Bradley,* 42 Ohio St.3d 136, 142, 538 N.E.2d 373, at fn. 1, quoting *Strickland*, at 693. Although an objection to the testimony may have been appropriate, we cannot conclude that the failure to do so resulted in prejudice that undermined the "fundamental fairness" of the proceedings. *Strickland,* at 697. Again, the jury had before it the videotaped confession by Appellant that he shot Blake. Standing alone, this was sufficient to establish guilt beyond a reasonable doubt. Further, allowing the officers to testify about what Fletcher told them does reveal a potential trial strategy, as Fletcher was the prime suspect and Appellant's involvement was not known to the police until Fletcher raised it. Potentially, trial counsel wanted to show that Fletcher was the shooter and that she implicated Appellant only to shift the focus from her own guilt. Regardless, there is no ineffective assistance shown, here.

{¶59} Appellant also asserts counsel was ineffective for failing to file a motion to suppress the recorded conversation between Appellant and his girlfriend for "invasion of

privacy." According to the record, the conversation took place after Appellant's second interview where he confessed he was the shooter. Following his confession, his girlfriend was allowed to visit him in the interview room. Det./Sgt. Spotleson testified on cross-examination that the recording equipment was still on and that the camera was hidden. (1/3/17 Tr., p. 366.) Det./Sgt. Spotleson also testified that Appellant was not told he was being recorded while speaking with his girlfriend. *Id.* The conversation between Appellant and his girlfriend is brief. In this portion of the video, the jury could see Appellant apologizing to his girlfriend and clearly stating "I told them I shot him," and "I pulled the trigger." (State's Exh. 66.) No actual testimony was elicited from any witness regarding Appellant's conversation with his girlfriend and there was no indication that any new information was gleaned by law enforcement during the conversation. In fact, contrary to Appellant's assertion that the state "heavily relied" on the conversation in its closing argument, other than being raised in the briefs before us, the only reference is in the state's closing where the prosecutor stated, "[b]ut in the end, he still says, I pulled the trigger. And he tells his girlfriend that outside the presence of the police." (1/3/17 Tr., pp. 457- 458.)

{¶60} The "failure to file a suppression motion does not constitute per se ineffective assistance of counsel." *State v. Madrigal,* 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000) citing *Kimmelman v. Morrison,* 477 U.S. 365, 384, 106 S.Ct. 2574, 91 L.Ed.2d. 305 (1986). Under the two-part test for assessing whether trial counsel was ineffective, we look first to whether trial counsel's performance fell below an objective standard of reasonable competence. This portion of the video was played to the jury after they had already seen Appellant's videotaped confession to the detectives. The only other

reference at trial to the conversation was briefly in the state's closing argument. It is clear counsel could not be deemed ineffective for failing to seek suppression of the recording. As Appellant had just admitted to the detectives that he was the shooter, the same admission by Appellant to his girlfriend would be only cumulative evidence for the state. The video itself shows Appellant and his girlfriend embracing and crying as he informed her that he shot the victim.

{¶61} Appellant cites our holding in *State v. Clemons*, 7th Dist. No. 10 BE 7, 2011-Ohio-1177 as support. However, Appellant concedes that we held in *Clemons* that there can be no reasonable expectation of privacy in a police interrogation room. In *Clemons*, the defendant argued that a recording of his conversation with his wife in the police interrogation room constituted a violation of the Fourth Amendment and Ohio electronic surveillance laws. *Id.* at ¶ 3. The defendant had voluntarily given a statement to police in the interrogation room and was informed of his *Miranda* rights. All interrogations in the room were recorded although interviewees were not informed unless they asked. At the end of the interview Clemons was given five minutes to speak with his wife. Clemons admitted to his wife, "I'm caught." *Id.* at ¶ 55. The conversation was recorded on video. Clemons filed a motion to suppress based on spousal privilege. R.C. 2317.02(B). The trial court denied the motion to suppress. On appeal, Clemons abandoned the spousal privilege argument and contended the recording violated his Fourth Amendment right against illegal search and seizure. *Id.* at ¶ 57. We affirmed the judgment of the trial court concluding:

> [T]here is really nothing to distinguish a police interrogation room from conversations in the back of a police car. Leaving the interrogation room

and closing the door is similar to leaving a patrol car and closing the door (or walking away where the subjects can see the officer is too far away to overhear their conversation).

*Id.* at ¶ 75.

**{¶62}** We held that the trial court "could rationally find that an objective person had no reasonable expectation of privacy under the circumstances existing herein." *Id.* at ¶ 76. As in *Clemons*, Appellant had admitted his crime to the police officers and was allowed to speak with his girlfriend directly afterward. Appellant distinguishes *Clemons* based on the fact that the interrogation room in that case had a large mirror which would indicate that there was surveillance. However, this argument is not persuasive. As in *Clemons,* the camera was hidden, the subjects were not informed they were being recorded. Notably, also as in *Clemons*, Appellant was under arrest and in custody before his interview and had been read his *Miranda* warnings. At the time he had the conversation with his girlfriend, he had spent over an hour in the interrogation room with two police detectives to whom he admitted that he shot Blake. Based on these circumstances and as in *Clemons*, "[t]he general public has no reason to frequent" a police interrogation room "or to believe that it is a sanctuary for private discussions." *State v. Wynter,* 2d Dist. No. 97CA76, 1998 WL 127092, at *6 quoting *U.S. v. Clark,* 22 F.3d 799, 801-802, (8th Cir.1994). We conclude that Appellant had no reasonable expectation of privacy in the interrogation room. Therefore, there was no violation of his privacy or Fourth Amendment rights. As such, trial counsel's decision not to file a motion to suppress the conversation was not deficient performance under the *Strickland* standard for ineffective assistance of counsel as Appellant has not demonstrated that the filing of

the motion to suppress would have a reasonable probability of success. *State v. Gettings,* 7th Dist. No. 16 MA 0050, 2017-Ohio-7764, at ¶ 24. Appellant's third assignment of error is without merit and is overruled.

## ASSIGNMENT OF ERROR NO. 4

The cumulative effect of numerous errors deprived Appellant of his right to a fair trial.

{¶63} Appellant contends that the cumulative effect of numerous errors at trial deprived him of a right to a fair trial. Specifically, Appellant contends that his previous assigned errors relating to the Confrontation Clause, ineffective assistance of counsel and unreasonable search and seizure all culminate in a violation of his right to a fair trial although each of the errors individually do not warrant a reversal.

{¶64} Under the doctrine of cumulative error, a conviction will be reversed when the cumulative effect of multiple errors, which are deemed harmless by themselves, in combination deprive a defendant of the constitutional right to a fair trial. *State v. Thomas,* 7th Dist. No. 17 BE 0028, 2018-Ohio-3768, ¶ 53 citing *State v. Baer,* 7th Dist. No. 07 HA 8, 2009-Ohio-3248, ¶ 82 and *State v. Garner,* 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995). However, the cumulative error doctrine does not apply when the errors alleged are nonexistent. *Id.*; *State v. Brown,* 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506, ¶ 48.

{¶65} It is not sufficient to just "intone the phrase cumulative error." *State v. Agee,* 7th Dist. No. 14 MA 0094, 2016-Ohio-7183, ¶ 72 citing *State v. Young,* 7th Dist. No. 07 MA 120, 2008-Ohio-5046, ¶ 65, quoting *State v. Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, ¶ 197. "Thus, where an appellant raises the doctrine without

Case No. 17 MA 0033

further analysis, the assignment of error has been held to lack substance." *Agee* at ¶ 72, quoting *Young*, *supra*, at ¶ 65, citing *State v. Sapp,* 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239, ¶ 103.

**{¶66}** Considering our resolution of the assignments of error on this appeal, all errors claimed by Appellant either fail or are harmless. Thus, there is no cumulative prejudicial error. Appellant does not engage in any analysis regarding how the alleged cumulative error resulted in a prejudice or denial of a fair trial. Therefore, Appellant's fourth assignment of error is without merit and is overruled.

## ASSIGNMENT OF ERROR NO. 5

Appellant was denied his constitutional and statutory right to a speedy trial

and his right to the effective assistance of counsel when counsel filed [sic]

to seek his discharge on speedy trial grounds.

**{¶67}** In his fifth assignment of error, Appellant contends he was not brought to trial in a reasonable time after two mistrials were declared, in violation of his right to a speedy trial.

**{¶68}** Appellant acknowledges that his trial counsel failed to raise the issue of speedy trial before the trial court. (Appellant's Brf., p. 40.) The issue of speedy trial cannot be raised for the first time on appeal. The failure to file an appropriately timed motion on speedy trial grounds constitutes a waiver of the issue on appeal. *State v. Hergenroder,* 7th Dist. No. 07 CO 17, 2008-Ohio-2410, ¶ 13 citing *State v. Trummer,* 114 Ohio App.3d 456, 470-471, 683 N.E.2d 392 (7th Dist.1996); *State v. Turner,* 168 Ohio App.3d 176, 2006-Ohio-3786, 858 N.E.2d 1249, ¶ 21 (5th Dist.).

**{¶69}** However, even if Appellant had not waived this issue for purposes of appeal, a review of this record indicates no speedy trial violation. Appellant's time calculation for speedy trial purposes is two-fold. First, he contends that as his charges were felonies, his speedy trial time under R.C. 2945.71(C) was 270 days. Second, Appellant urges that as he was being held solely on these charges, he was entitled to the triple-count provision enumerated under R.C. 2945.71(D), bringing his speedy trial time to 90 days. Although Appellant references R.C. 2945.71(D), the triple-count provision is set forth in R.C. 2945.71(E).

**{¶70}** Appellant's calculation is as follows. He was arrested on March 3, 2012 and indicted on March 8, 2012. He executed a waiver of speedy trial on April 25, 2012. He executed an unlimited waiver on September 13, 2012. Appellant filed a *pro se* revocation of his speedy trial waiver which was never ruled on by the trial court. Finally, he was not brought to trial until January 3, 2017. He contends he was held for 54 days when he initially executed his limited waiver and his unlimited waiver was effective until June 9, 2015, when he filed his *pro se* revocation of that unlimited waiver. Appellant concedes that in the 18 months between filing his *pro se* revocation and the time the third trial commenced, some time was tolled for his competency evaluation and for the trial court's *sua sponte* declaration of a mistrial based on his federal habeas petition, but Appellant still contends that the state still failed to bring him to trial within a reasonable time period.

**{¶71}** The state responds that no speedy trial violation occurred because when utilizing the proper standard and accounting for tolling, Appellant was brought to trial within a reasonable time period.

Case No. 17 MA 0033

**{¶72}** R.C. 2945.71(C) provides, "[a] person against whom a charge of felony is pending: * * * (2) [s]hall be brought to trial within two hundred seventy days after the person's arrest."

The triple-count provision asserted by Appellant provides, in pertinent part:

For purposes of computing time under divisions (A), (B), (C)(2), and (D) of

this section, each day during which the accused is held in jail in lieu of bail

on the pending charge shall be counted as three days.

R.C. 2945.71(E).

**{¶73}** The Ohio Supreme Court has held that the triple-count provision of R.C. 2945.71(E) does not apply to retrials after a jury was unable to reach a verdict. *State v. Fanning,* 1 Ohio St.3d 19, 21, 437 N.E.2d 583 (1982). The *Fanning* Court noted that the statute was "not applicable to retrials" and "the standard to be applied" is "basically reasonableness under federal and state constitutions." *Id.* That holding was restated in *State v Hull,* 110 Ohio St.3d 183, 2006-Ohio-4252, ¶ 14. In *Hull* the Court also concluded that R.C. 2945.71 did not apply to criminal convictions overturned on appeal. *Id.* at paragraph one of the syllabus. The Court has reasoned that as the statute does not refer to retrials, it is only to be applied to an original trial. *Id.,* at ¶ 21. The *Hull* Court concluded that 149 days is reasonable under the federal and state constitutions for speedy trial purposes after a matter has been remanded by an appellate court. *Id.* at paragraph two of the syllabus.

**{¶74}** Here, Appellant executed an unlimited waiver on April 25, 2012. The first trial commenced on February 25, 2014. That jury found him not guilty of the aggravated murder charge but was unable to reach a unanimous verdict on the other charges. A

Case No. 17 MA 0033

mistrial was declared by the trial court in a judgment entry dated March 4, 2014. Appellant's second trial on the remaining charges began on January 11, 2016. This also resulted in a mistrial, as Appellant had filed a federal habeas petition relating to the matter on October 7, 2015. The habeas was not dismissed until September 16, 2016. Appellant's third trial commenced on January 3, 2017 and the jury found him guilty of the remaining charges. Doing a calculation of the time periods here and considering all tolling events, Appellant was brought to trial within 109 days. We conclude that 109 days is reasonable under the federal and state constitutions. Therefore, Appellant's right to a speedy trial was not violated. Appellant's fifth assignment of error is without merit and is overruled.

## Conclusion

{¶75} Appellant has not established any Confrontation Clause violation rising to the level of harmful error, nor has he established prosecutorial misconduct, ineffective assistance of trial counsel, cumulative error or a speedy trial violation. Appellant's assignments of error are without merit and the judgment of the trial court is affirmed.

Donofrio, J., concurs.

Robb, J., concurs.

Case No. 17 MA 0033

---

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed.  Costs waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure.  It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

**<u>NOTICE TO COUNSEL</u>**

**This document constitutes a final judgment entry.**